# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
### October 3, 2012 Session

## STATE OF TENNESSEE v. KIMBERLY MANGRUM

**Appeal by Permission from the Court of Criminal Appeals**
**Circuit Court for Dickson County**
**No. CR7087A      George C. Sexton, Judge**

---

**No. M2009-01810-SC-R11-CD - Filed March 27, 2013**

---

A Dickson County grand jury returned an indictment charging the defendant with especially aggravated burglary, especially aggravated kidnapping, first degree premeditated murder, and first degree felony murder.  Later the same day, the grand jury returned a superseding indictment re-charging the defendant and her husband with the same offenses, but adding a charge of criminal conspiracy as to each.  The prosecution subsequently granted immunity to the defendant's step-daughter and issued a subpoena for her appearance, and the grand jury reconvened to hear her testimony.  The defendant filed a motion to quash the subpoena, arguing that the purpose of the testimony was to improperly acquire evidence to support the pending charges against her.  The trial court denied the motion to quash.  After the defendant's step-daughter testified before the grand jury, a second superseding indictment was issued charging all offenses in the first indictment and adding a charge of accessory after the fact against the defendant's husband.  The defendant then filed motions to suppress any testimony by the defendant's step-daughter at trial and to dismiss all pending indictments. The trial court denied each motion.  At the conclusion of the trial, the jury found the defendant guilty of aggravated burglary, especially aggravated kidnapping, attempted first degree premeditated murder, and first degree felony murder.  After merging the convictions for attempted premeditated murder and felony murder, the trial court imposed a life sentence for the murder and concurrent sentences of twenty-five and six years, respectively, for the especially aggravated kidnapping and the aggravated burglary.  On appeal, the defendant claimed that the trial court should have dismissed the charges because of prosecutorial abuse of the grand jury process.  The Court of Criminal Appeals disagreed and affirmed the judgment of the trial court.  We affirm the judgment of the Court of Criminal Appeals.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Criminal**
**Appeals Affirmed**

GARY R. WADE, C.J., delivered the opinion of the Court, in which JANICE M. HOLDER,

CORNELIA A. CLARK, WILLIAM C. KOCH, JR., and SHARON G. LEE, JJ., joined.

William B. Lockert, III, District Public Defender, for the appellant, Kimberly Mangrum.

Robert E. Cooper, Jr., Attorney General and Reporter; William E. Young, Solicitor General; and Rachel Harmon, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts and Procedural History
### A. Initial Investigation

On September 8, 2002, a fisherman found the body of the victim, later identified as LeeAnn Mangrum, floating in the Turnbull Creek in Dickson County. The Dickson County Sheriff's Office and the Tennessee Bureau of Investigation ("TBI") searched the bank of the creek and found hair follicles similar in color to that of the victim. An autopsy revealed severe blunt force trauma to the head of the victim and bruising to her torso and buttocks, but indicated drowning as the cause of death.

On the day following the discovery of the body, the police separately interviewed the following individuals: Terry Mangrum, Sr. ("Terry Sr."), the victim's ex-husband; Kimberly Mangrum (the "Defendant"), the wife of Terry Sr.; and the two children from the victim's marriage to Terry Sr.: daughter A.M.,[1] who was eleven years old at the time, and son Terry Mangrum, Jr. ("Terry Jr."),[2] who was fifteen years old at the time.[3] Each of these individuals denied any involvement in the murder but did tell officers that the victim, accompanied by a man who had "salt and pepper" hair, had come to their residence to ask for pain pills on the night before the discovery of her body. The Defendant informed the officers that she had given the victim a Klonopin pill and speculated that the victim might have also taken her pill bottle, which was missing after the visit. According to the Defendant, the victim had been driving a dark-colored Mustang with a Harley-Davidson plate on the front.

As these interviews took place, officers with the crime scene unit searched the victim's trailer, which was in disarray. One of the windows was broken, furniture was

---

[1] A.M. is identified by her initials because she was a minor during the events and trial of this case.

[2] Consistent with the briefs and much of the record, we refer to this individual as "Terry Jr.," although he is identified as "Terry Mangrum, II" in other portions of the record.

[3] Following the victim's separation from Terry Sr., both Terry Jr. and A.M. initially lived with the victim. Prior to the events in this case, however, the Tennessee Department of Children's Services had granted custody of the children to Terry Sr.

overturned, and clothes had been strewn about the interior of the trailer. The officers found a cigarette butt in the yard outside the trailer that appeared to have been there no longer than a day or two. The officers also found blood on the exterior of a window and discovered finger and palm prints on fragments of broken window glass. Despite the evidence of a struggle, however, the police were initially unable to home in on a suspect.

A year passed without any significant developments in the investigation. In December 2003, however, the police obtained DNA samples from Terry Sr. and Terry Jr. and determined that Terry Jr.'s DNA matched that of the blood found on the window. The police further determined that the fingerprints on the broken glass were those of Terry Jr. and that the palm print was that of A.M.

On February 11, 2004, the police obtained a search warrant authorizing the taking of a DNA sample from the Defendant. During the execution of the warrant, the Defendant began to describe the events surrounding the murder, stating that she, Terry Jr., and A.M. had met the victim for lunch approximately two weeks prior to the murder in order to address their family problems. Without any prompting by the officers, she also related that she had visited the victim at her trailer and, while there, had smoked cigarettes that would likely contain her lipstick. After this conversation, the police were able to confirm that a cigarette butt found in the victim's yard contained the DNA of the Defendant.

### B. First Grand Jury Proceeding

On February 23, 2004, District Attorney General Dan Alsobrooks (the "District Attorney") convened a grand jury, which indicted the Defendant for especially aggravated burglary, especially aggravated kidnapping, first degree premeditated murder, and first degree felony murder. Later the same day, the grand jury returned a superseding indictment charging the Defendant and Terry Sr. with each of the offenses described in the original indictment, but adding charges of criminal conspiracy as to each of those offenses.

After her arrest and upon having been advised of her Fifth Amendment rights, the Defendant signed a written waiver of her rights. In a recorded interview, she denied involvement in the death of the victim and asserted that she suspected Terry Jr. because she believed that he had taken her car on the day of the murder without asking her permission. She expressed an awareness that her DNA had been found outside the trailer, explaining that she and Terry Sr. had been there four or five days before the murder and that she had disposed of her cigarette butts in the yard. The Defendant repeated her claim that she had given the victim a Klonopin pill on the night before the murder and also asserted that A.M. had reported finding "something" in her backpack relating to the death of the victim.

When the police interviewed A.M., she at first offered the same account she and her

family had initially provided; however, when the police told her that they knew her claims were untrue, A.M. recanted, stating that on the day of the murder, Terry Sr. and Terry Jr. had driven to the victim's trailer in the Defendant's Mustang. She told the police that upon their return, Terry Jr. admitted to her that he had argued with the victim over the custody arrangement and then killed her. A.M. confessed to the officers that she and her family had concocted the story about the victim coming by their house asking for pills in an effort to protect Terry Jr. A.M. also provided the officers with a note, handwritten by Terry Jr., which she claimed to have found in her backpack. The note, dated February 4, 2004, 2:03 a.m., consisted of the following statement: "I Terry W. Mangrum admit to the murder of LeeAnn ~~Mangrum~~ Smith. She was my mother if you want to call her that. I'm writing this because the T.B.I. came and took the cigerate [sic] butt of my step mother and a sample of her DNA."[4]

On the same day, officers approached Terry Jr. at his high school and, after obtaining a written waiver of his Fifth Amendment rights, recorded their interview. Terry Jr. claimed to the officers that he had accidentally driven the victim's Jeep into a creek and that she was killed as a result. Terry Jr. mentioned several times during the interview that he was a minor at the time of the incident and understood that he would be subject to a lesser punishment because of his age. While doubtful of the authenticity of his claims, the officers took Terry Jr. into custody.

### C. Motion to Quash Subpoena and Reconvened Grand Jury Proceeding

Following Terry Jr.'s arrest, his grandparents employed attorneys to represent him and his sister, A.M. In December 2004, the State, with the intention of reconvening the grand jury, subpoenaed A.M. to appear and provide testimony regarding the murder. Upon the advice of her attorney, A.M. refused to testify absent a grant of immunity, which the State granted in exchange for her testimony before the grand jury and at trial. Afterward, the Defendant filed a motion to quash the State's subpoena for A.M.'s testimony before the grand jury. A.M., through her counsel, joined in the motion to quash. The Defendant contended that because the State's real purpose was to further investigate the pending charges, the subpoena constituted an abuse of the grand jury process.

At the hearing on the motion, the District Attorney, who was called as a witness by the Defendant, testified that he did not believe the initial claim by the members of the Mangrum family that the victim had visited their residence just prior to her death in the company of "a mysterious man with salt and pepper hair." He acknowledged that before the issuance of the subpoena, he had engaged in "extensive conversations" with A.M.'s attorney,

_____

[4] Terry Jr. testified at trial that he initially wrote the victim's surname as "Mangrum," but that the Defendant made him strike out "Mangrum" and replace it with "Smith," the victim's maiden name.

which provided him with "some different insight into th[e] case." Despite his reluctance to speculate about the testimony A.M. might ultimately offer, the District Attorney acknowledged that "what [was] proffered [was] additional inculpatory evidence against [the Defendant]." He recognized that he could have offered A.M. immunity for her testimony at trial rather than compel her to testify before the grand jury; however, he claimed to have acted under his belief that A.M.'s testimony might provide a basis for the grand jury to either add charges against the existing defendants or charge other individuals who may have been involved in the murder, especially given the "many twists and turns" that had developed during the course of the investigation. The District Attorney denied any intent to use the grand jury as "an investigative" body, asserting that his purpose was "re-presenting the case with the possibility of additional charges being placed [and] the possibility of [adding] defendants who [the State] might not know of at this point in time." In a similar vein, the District Attorney stated that he wanted the grand jury to hear A.M.'s testimony because

> there have been other suspects in this case. . . . [A.M.] should be able to tell us with an eyewitness account one of two things, what happened at the time her mother was murder[ed] or at a very minimum, if she didn't go to the scene, she would be able to tell us before and afterwards who was involved.

The District Attorney conceded that calling A.M. to testify before the grand jury would also further the State's objective of "know[ing] as much of the truth pretrial as possible" and that "[i]t is helpful to the [S]tate . . . to know . . . what [witnesses are] going to say under oath."

The grand jury foreman, called as a witness by the State, testified that the purpose of the proceeding was to hear testimony from A.M. in an effort to learn "[w]ho was involved in this case and to what extent they were involved." The foreman explained that determining who should be indicted and on what charges had been "difficult because it was all family involved. Initially [Terry Jr.] was the one supposed to have been alleged to have done it; but during the time [of] this investigation [it was discovered that] there were more persons involved, so we'd like to know how many and who they are."

At the conclusion of the hearing, the trial court denied the motion to quash the subpoena.[5] Declining to apply the traditional rule that a grand jury subpoena is subject to being quashed if its <u>dominant</u> purpose is to conduct discovery on pending charges, the trial court held that no abuse of the grand jury process occurred because discovery was "not the <u>sole</u> purpose" of the subpoena. (Emphasis added.)

---

[5] Judge Robert E. Burch presided over the hearing on the motion to quash and issued the order denying the motion. In all subsequent proceedings, Judge George C. Sexton presided.

Following the denial of the motion, the grand jury reconvened on January 20, 2005, to hear the testimony of A.M. Initially, A.M., who was fourteen years old at the time, confirmed her understanding that she had been granted immunity from all possible charges related to the murder. A.M. testified that despite some "bad times," she had a good relationship with the victim even though the victim had hit her in the past and may have sexually abused her. In contrast, she described her relationship with the Defendant as "terrible," claiming that the Defendant subjected her and her brother, Terry Jr., to extreme physical abuse. A.M. asserted that the Defendant had forced her to call both the victim and the victim's father to say that she "hate[d] them and wish[ed] they would die." She contended that she and Terry Jr. lived in fear of the Defendant, who would physically abuse them and threaten to have them killed if they did not follow her orders. A.M. testified that the Defendant frequently made negative comments about the victim, calling her a "prostitute" and a "slut" and often threatening to kill her. A.M. insisted that her father, Terry Sr., had no knowledge of the Defendant's misbehavior. She further testified that on the night of September 7, 2002, after Terry Sr. had gone to bed, the Defendant, who had "gloves and stuff like that" in her possession, forced her and Terry Jr. to get in her car in an effort to find the victim. According to A.M., the Defendant first drove to the victim's trailer but did not find her there. As she drove away, however, the Defendant saw the victim drive by in her Jeep, turned, followed the victim back to the trailer, and ordered A.M. and Terry Jr. to put on gloves. A.M. told the grand jury that the Defendant then took a baseball bat from the back seat, ordered Terry Jr. out of the car, and used the bat to break the driver-side window of the Jeep. When the victim tried to drive away, the Defendant dragged her out of the car into the yard, repeatedly struck her with the bat, and ordered Terry Jr. to hit her with a piece of wood. According to A.M., when Terry Jr. initially refused to strike the victim, the Defendant, who was smoking a cigarette, threatened to beat him.

A.M. described the victim as "bleeding" and "unconscious" from the assault. She stated that the Defendant instructed her and Terry Jr. to help move the victim into the Jeep. As the Defendant drove her Mustang to a nearby creek, Terry Jr. followed her in the Jeep. After arriving at the creek, A.M., Terry Jr., and the Defendant moved the victim from the back seat of the Jeep to the creek bank. A.M. stated that the Defendant then instructed her to take a medicine bag from the Mustang and to stuff pills down the victim's throat. A.M. explained that when she was shaking so badly that she was unable to perform as directed, the Defendant forced the pills into the victim's mouth and rolled her into the creek. A.M. told the grand jury that the Defendant threatened to "kill [her and Terry Jr.] in the same way or even worse" if they ever told anyone what had happened and, after a few minutes, instructed Terry Jr. to go into the creek to "make sure [the victim was] dead." When Terry Jr. refused, the Defendant threatened him, shoved him into the water, and watched as Terry Jr. held the victim under water with his foot. The Defendant then drove the Jeep into the creek. Afterward, the Defendant drove her Mustang back to the victim's trailer, and, according to

A.M., directed Terry Jr. to break a window in the back and made A.M. crawl through the window to open the entry door from the inside. A.M. recalled that Terry Jr. may have cut his arm when he broke the window. She further testified that the Defendant went inside to smash several of the victim's possessions, such as pictures and furniture, and forced her and Terry Jr. to take jewelry and other valuables. A.M. stated that at some point the Defendant directed A.M. to call her maternal grandmother, using the victim's cell phone. Although A.M. could not remember what she had said to her grandmother, she testified during the grand jury proceeding that the Defendant instructed her to pretend to be the victim and told her what to say. Eventually, they left the trailer and returned to their residence.

According to A.M., when the Defendant informed Terry Sr. of the murder, he became upset and began to argue loudly with the Defendant. A.M. also remembered that roughly one month after the murder, she, Terry Jr., and the Defendant threw the baseball bat used during the murder into a creek located near their residence.

After hearing the testimony of A.M., the grand jury returned a second superseding indictment, charging the Defendant and Terry Sr. with the same offenses listed in the first superseding indictment, but adding a count against Terry Sr. for accessory after the fact.[6]

### D. Motions to Suppress and Dismiss

On March 9, 2005, the Defendant filed a motion to suppress the trial testimony of A.M. on the basis that the District Attorney had abused the grand jury process by compelling A.M. to testify for the purpose of investigating the pending charges. On March 14, 2005, the Defendant filed a motion to dismiss all indictments against her based upon the alleged abuse of process. During the hearing on the motions before the trial court, the defense called as a witness the grand jury foreman, who testified that the grand jury had reconvened to hear testimony from A.M. because the jurors "felt there was additional information needed in order to find out exactly what occurred." When asked what changes the grand jury made to the indictment following the January 20th proceeding, the foreman stated that a correction was made to the name of Terry Jr.[7] and that Terry Sr. was charged with a new count of accessory after the fact. He further stated that he believed "the truth was revealed" through A.M.'s testimony and concluded that A.M.'s grand jury testimony "added" significantly to the information previously provided by the investigating officers and "made it clearer as to

---

[6] The second superseding indictment charges "Terry Mangrum" but does not specify to which Terry Mangrum it refers; however, the date of birth on the second superseding indictment, the judgment against Terry Sr., and statements by counsel during a later hearing all indicate that the second superseding indictment refers to Terry Sr. Terry Jr. was charged in a separate indictment.

[7] As noted above, the record reflects that Terry Jr. was charged in a separate indictment from the Defendant and Terry Sr.; however, the indictment charging Terry Jr. was not included in the appellate record.

what the situation really was."

At the conclusion of the proof on the motions to suppress and dismiss, the trial court[8] refused to grant relief:

> [B]ased upon what I've heard from [the grand jury foreman], I can't find that . . . calling [A.M.] was . . . for the <u>sole and dominant</u> purpose of discovering facts, based on the defendants' previous indictment.
>
> . . . .
>
> So . . . finding that [A.M.] was not called for the <u>sole</u> purpose of obtaining inculpatory information and the defendant having the burden of proof showing that was the <u>sole</u> purpose of calling the witness to testify, the motions are overruled.

(Emphasis added.)

### E. Trial and Appeal

The trial of the Defendant on the second superseding indictment was severed from that of each of her co-defendants. Robert C. Smith, a witness for the State, testified that on Saturday, September 7, 2002, he met the victim and a few other friends at a local bar to watch a football game. He recalled that the victim left between 11:30 p.m. and midnight. The victim's mother, Betty Wade, testified that the victim had called her between 9:00 and 9:30 p.m. on the same night to make arrangements to attend church the next morning. She stated that she received a call from the victim's cell phone at 5:20 a.m. on the following morning, but no one was on the line. When she returned the call, she heard someone other than the victim say, "Mamma, please, help me. I'm scared. . . . [H]elp me, I'm afraid." While acknowledging that there was "something familiar about the voice," Ms. Wade was unable to recognize the caller. Alarmed by the call, Ms. Wade immediately contacted Agnes Sullivan, a neighbor of the victim.

Ms. Sullivan testified that when she received the call from Ms. Wade, she looked outside but did not see the victim's Jeep at her trailer. Later in the day, Ms. Sullivan, who had a key to the trailer, entered the trailer and discovered that the furniture had been knocked over and that there was broken glass on the floor.

A.M., also called as a witness for the State, provided testimony at the trial practically

---

[8] As indicated, Judge George C. Sexton presided over the hearing on these motions.

identical to that she had presented to the grand jury in the January 20, 2005 proceeding. Terry Jr., who by the time of the trial had pled guilty to a reduced charge of second degree murder, also testified on behalf of the State. He contended that there had been "bad blood" between the Defendant and the victim, which had resulted in several altercations over a period of time. He acknowledged that the Defendant had abused him and his sister numerous times, specifically recalling that on one occasion the Defendant had burned him severely with a cigarette and, on another, had cut his throat with a coat hanger. He asserted that the Defendant had subjected A.M. to similar abuse and orchestrated phone calls in which A.M. was forced to make hateful comments to the victim. Terry Jr.'s testimony corroborated A.M.'s account of the murder in that he said the Defendant grabbed the victim by her hair, dragged her from the Jeep, and struck her repeatedly with a baseball bat. Terry Jr. further claimed that the Defendant "made [him] hit" the victim with a piece of wood despite his initial reluctance to do so, and he conceded that he had held the victim under water to make sure that she was dead, explaining that he had done so at the Defendant's insistence. Terry Jr. confirmed that he and A.M. accompanied the Defendant back to the trailer, gained entry by breaking a window, and ransacked the interior, taking certain valuables. He said that afterward, the Defendant forced him and his sister to thoroughly clean the Mustang.

Terry Jr. further testified that the Defendant had fabricated the story about the victim visiting the Mangrum house looking for pain pills on the night before the murder. He claimed that the Defendant had threatened to kill him and A.M. if they did not stick to that story when interviewed by the police. Terry Jr. acknowledged that after the police obtained the Defendant's DNA sample, he wrote a note dated February 4, 2004, in which he claimed sole responsibility for the murder, but he contended that he had done so only after the Defendant threatened him at knifepoint. After the State produced a recording of the police interview in which Terry Jr. confessed that he had acted alone in the murder, Terry Jr. explained that he had lied to the police during the interrogation at the insistence of the Defendant, who had threatened to kill him and had informed him that, because he was a minor, he would spend only a few years in prison.

Ronald Durham, a neighbor of the Mangrums, was called as a witness for the State to corroborate a portion of Terry Jr.'s testimony. He confirmed that on the day of the murder he had seen Terry Jr. and A.M. spend hours cleaning the Mustang. TBI Agent Joe Minor verified that the DNA on the cigarette butt recovered from the victim's yard matched the Defendant's DNA sample. He also confirmed that the DNA obtained from the blood on the window of the victim's trailer matched that of Terry Jr. Agent Hoyt Phillips, a fingerprint examiner in the forensic division of the TBI, testified that the fingerprints recovered from the piece of broken window glass found at the trailer were those of Terry Jr., and the palm print was that of A.M. Dr. Thomas Deering, the forensic pathologist who performed the autopsy, testified that he discovered severe blunt force trauma to the victim's head and contusions on

her torso and buttocks, all of which were consistent with multiple blows from a baseball bat. In his opinion, however, drowning was the cause of her death.

At the conclusion of the State's proof, the trial court acquitted the Defendant of especially aggravated burglary but allowed the State to proceed on the lesser included offense of aggravated burglary, as well as the other charges in the second superseding indictment. The jury returned guilty verdicts for aggravated burglary, especially aggravated kidnapping, attempted first degree premeditated murder, and first degree felony murder. After merging the attempted premeditated murder conviction with the felony murder conviction, the trial court imposed concurrent sentences as follows: life imprisonment for the felony murder conviction, twenty-five years for the especially aggravated kidnapping conviction, and six years for the aggravated burglary conviction.[9]

In her appeal to the Court of Criminal Appeals, the Defendant challenged the sufficiency of the evidence and asserted prosecutorial abuse of the grand jury process. The Court of Criminal Appeals affirmed the judgment of the trial court. State v. Mangrum, No. M2009-01810-CCA-R3-CD, 2011 WL 5387594, at *9 (Tenn. Crim. App. Nov. 9, 2011). This Court granted review to address the proper scope and use of grand jury proceedings, which is an issue of first impression.

## II. Analysis

This appeal requires a determination of whether the trial court erred by denying the motion to quash the subpoena for A.M. to provide grand jury testimony or by denying the motions to suppress A.M.'s trial testimony and to dismiss all indictments against the Defendant.

### A. Purpose and Scope of Grand Jury Proceedings

The grand jury—an institution with common-law roots dating back to twelfth-century English law—has traditionally served a screening function in the criminal law, with the purpose of evaluating evidence of criminal offenses and returning an indictment if, and only if, the evidence establishes probable cause that a crime was committed and that the accused committed the crime. See Black's Law Dictionary 767 (9th ed. 2009) (quoting Frank W. Miller et al., Cases and Materials on Criminal Justice Administration 546 (3d ed. 1986)); W. Mark Ward, Tennessee Criminal Trial Practice § 11-2, at 263-65 (2009-2010 ed.) [hereinafter Ward]. In order to ensure the role of the grand jury "as a 'shield' protecting citizens from unjust prosecution," Ward § 11-2, at 264, our Constitution provides "[t]hat no person shall be put to answer any criminal charge but by presentment, indictment or

---

[9] Some time after the Defendant's trial, Terry Sr. pled guilty to accessory after the fact, and the State voluntarily dismissed the remaining charges against him in the second superseding indictment.

impeachment."[10]  Tenn. Const. art. I, § 14.  One hundred and sixty-five years ago, this Court explained that

> the object of this provision . . . [is] to guarantee to every freeman the great privilege and security of not being put to answer any criminal charge affecting the right to life or liberty without a written accusation, previously verified by the oath of a grand jury, in the form of a presentment or indictment.

McGinnis v. State, 28 Tenn. (9 Hum.) 43, 47-48 (1848); see also 9 David Louis Raybin, Tennessee Practice: Criminal Practice and Procedure § 9.3, at 268 (2008) [hereinafter Raybin] ("The grand jury is said to stand between the accuser and the accused . . . .").

Consistent with the traditional purpose of the grand jury and the constitutional mandate of article I, section 14, a Tennessee grand jury "has inquisitorial powers over—and has the authority to return a presentment—of all indictable or presentable offenses found to have been committed or to be triable within the county."  Tenn. R. Crim. P. 6(d).  The duties of the grand jury include, among other things, inquiring into, considering, and acting on all criminal cases submitted to it by the district attorney general (the "district attorney"); inquiring into any report of a criminal offense brought to its attention by a member of the grand jury; and reporting the results of its actions to the trial court.[11]  Tenn. R. Crim. P. 6(e).

The grand jury may work with, but not for, the district attorney.  Stanley v. State, 104 S.W.2d 819, 822 (Tenn. 1937) ("The grand jury is not an agency of the district attorney or of the court."); see also Raybin § 9.3, at 268 (noting the independence of the grand jury from the district attorney).  Witnesses may be subpoenaed to appear by either the grand jury or the district attorney.  Tenn. R. Crim. P. 6(g)(4)(B)–(C), (i)(2), (j)(1).  A witness who refuses to provide grand jury testimony may be compelled to testify, but only if the district attorney grants the witness immunity from prosecution for any offense related to the subject of his or her testimony; similarly, any witness compelled to testify before the grand jury is

---

[10] The Fifth Amendment to the United States Constitution offers similar protection, providing that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on presentment or indictment by a Grand Jury."  U.S. Const. amend. V.  This provision, however, does not apply to state proceedings.  Alexander v. Louisiana, 405 U.S. 625, 633 (1972); Hurtado v. California, 110 U.S. 516, 538 (1884).

[11] Tennessee statutory law also provides for the assembly of an investigative grand jury, which is authorized to investigate certain enumerated offenses, such as money laundering, bribery, and misconduct involving public officials.  See Tenn. Code Ann. § 40-12-201(a) (2012).  It is undisputed that the grand jury in this instance was not of the investigative variety and that the provisions pertaining to investigative grand juries, see id. §§ 40-12-201 to -218, do not apply.

automatically entitled to immunity from indictment for any offense related to the testimony provided. See Tenn. R. Crim. P. 6(j)(5)–(6); State v. McCollum, 904 S.W.2d 114, 117 (Tenn. 1995). The district attorney or a designated assistant is authorized to attend grand jury proceedings for the purpose of examining witnesses and providing legal advice to the grand jury. Tenn. Code Ann. § 8-7-501 (2011); Tenn. R. Crim. P. 6(h)(1). However, neither the district attorney nor any other person may be present when the grand jurors vote on an indictment or presentment. Tenn. Code Ann. § 8-7-501; Tenn. R. Crim. P. 6(h)(1).

Each grand jury consists of twelve grand jurors and a foreperson, for a total of thirteen members. Tenn. R. Crim. P. 6(a)(1). The foreperson acts as the spokesperson for the grand jury but has the same voting power as any other grand jury member. See State v. Bondurant, 4 S.W.3d 662, 674-75 (Tenn. 1999) (quoting State v. Jefferson, 769 S.W.2d 875, 877-78 (Tenn. Crim. App. 1988)). The return of an indictment requires the concurrence of at least twelve of the members of the grand jury. Tenn. Code Ann. § 40-13-105 (2012). Prior to indictment, the district attorney "has virtually unbridled discretion in determining whether to prosecute and for what offense." Dearborne v. State, 575 S.W.2d 259, 262 (Tenn. 1978) (quoting Pace v. State, 566 S.W.2d 861, 867 (Tenn. 1978) (Henry, C.J., concurring)); see also State v. Harris, 33 S.W.3d 767, 771 (Tenn. 2000) ("'[S]o long as the prosecutor has probable cause to believe that the accused committed an offense . . . , the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely within his discretion.'" (quoting Bordenkircher v. Hayes, 434 U.S. 357, 364 (1978) (second alteration in original))). Upon the return of an indictment, however, "the disposition of the charge becomes a judicial function." Dearborne, 575 S.W.2d at 262 (quoting Pace, 566 S.W.2d at 867 (Henry, C.J., concurring)). Nevertheless, even after the return of an indictment, the district attorney retains the discretion to reconvene the grand jury for consideration of additional evidence and the possible return of a superseding indictment—that is, an indictment obtained without the dismissal of a prior indictment. Harris, 33 S.W.3d at 771. In Harris, this Court described the procedure as follows:

> The power to seek a superseding indictment lies within th[e] broad discretion of the State. . . . Where there has been no jeopardy on the first indictment, a grand jury may return a new indictment against an accused even though another indictment is pending. Although the State may not bring a superseding indictment to harass or intimidate the accused, a legitimate decision to bring a superseding indictment is uniquely within the State's authority. Thus, the State may obtain a superseding indictment at any time prior to trial without dismissing the pending indictment and may then select the indictment under which to proceed at trial.

Id. (citations and footnote omitted). This Court cautioned, however, that "the discretion of

the State is not infinite," and pointed out that trial courts retain the authority to dismiss an indictment based upon defects in the indictment or improper delay in presenting a charge to a grand jury. Id.

As the Court of Criminal Appeals observed in the case before us, a number of state and federal courts have recognized that "'it is improper to use the grand jury for the purpose of preparing [a case on] an already pending indictment for trial.'" Mangrum, 2011 WL 5387594, at *8 (quoting 2 Sara Sun Beale et al., Grand Jury Law and Practice § 9:16, at 9-71 (2d ed. 2005) [hereinafter Beale]) (alteration in original). The courts that have addressed this issue have concluded, almost without exception, that the proper inquiry is whether the "dominant" or "primary"[12] purpose of the grand jury proceeding at issue is to conduct discovery related to pending charges in preparation for trial. See, e.g., United States v. Salameh, 152 F.3d 88, 109 (2d Cir. 1998) (per curiam) ("It is improper for the government to use a grand jury subpoena for the sole or dominant purpose of preparing for trial." (quoting United States v. Sasso, 59 F.3d 341, 351 (2d Cir. 1995) (internal quotation marks omitted))); United States v. Breitkreutz, 977 F.2d 214, 217 (6th Cir. 1992) ("A court may not interfere with the grand jury's investigation '[s]o long as it is not the sole or dominant purpose of the grand jury to discover facts relating to [a defendant's] pending indictment.'" (quoting United States v. George, 444 F.2d 310, 314 (6th Cir. 1971) (alterations in original))); In re Grand Jury Proceedings (Fernandez Diamante), 814 F.2d 61, 70 (1st Cir. 1987) ("It is well established that a grand jury may not conduct an investigation for the primary purpose of helping the prosecution prepare indictments for trial."); United States v. Moss, 756 F.2d 329, 332 (4th Cir. 1985) ("Although the courts firmly safeguard the investigatory power of the grand jury, it is the universal rule that prosecutors cannot utilize the grand jury solely or even primarily for the purpose of gathering evidence in pending litigation."); Bishop v. Caudill, 87 S.W.3d 1, 4 (Ky. 2002) (holding that an abuse of the grand jury process occurs "if the sole or dominant purpose of [a] grand jury investigation is to discover facts relating to [an accused's] defense so as to assist the Commonwealth in its trial preparation"); Hynes v. Lerner, 376 N.E.2d 1294, 1296 (N.Y. 1978) ("[O]nce an indictment is issued, a Grand Jury subpoena duces tecum may not be used for the sole or dominant purpose of preparing the pending indictment for trial.").

This Court has previously explained that the function of the grand jury is limited to "determin[ing] whether or not there is sufficient evidence to justify bringing an accused to trial." State v. Felts, 418 S.W.2d 772, 774 (Tenn. 1967). In recognition of this limitation on the scope of the proceedings of a grand jury, we approve the rule adopted by numerous other state and federal courts that prosecutorial abuse of the grand jury process occurs when the

---

[12] It appears that several courts addressing this issue use the terms "dominant" and "primary" interchangeably. For the sake of consistency, we will adhere to the more commonly used term "dominant."

dominant purpose of a grand jury proceeding is to investigate a defendant for an offense for which he or she has already been indicted.[13]

An essential consideration in the application of this rule is that grand jury proceedings must be accorded a presumption of regularity. See Smith v. State, 369 S.W.2d 537, 539 (Tenn. 1963); see also United States v. R. Enters., Inc., 498 U.S. 292, 300 (1991) ("[T]he law presumes, absent a strong showing to the contrary, that a grand jury acts within the legitimate scope of its authority."). In observance of this presumption of regularity, trial courts must place upon a defendant alleging abuse of the grand jury process the burden of demonstrating that the dominant purpose of the proceeding is to seek information related to pending charges in order to prepare for trial. See Smith, 369 S.W.2d at 539; Breitkreutz, 977 F.2d at 217. If there is a legitimate dominant purpose for a grand jury proceeding, such as the presentation of new evidence for the grand jury to consider in determining whether to file new charges, then the presumption of regularity will persist, notwithstanding the fact that evidence adduced at the proceeding is also helpful to the State in its preparation for trial as to pending charges. See Sasso, 59 F.3d at 351-52; Hynes, 376 N.E.2d at 1296.

Moreover, a defendant alleging abuse of the grand jury process will generally be unable to overcome the presumption of regularity if the proceeding at issue results in the indictment of a previously uncharged individual or the return of additional charges against a previously indicted defendant. As the First Circuit Court of Appeals has observed, "These are purposes befitting the accepted institutional objectives of the grand jury, and their presence bears convincing witness to the propriety of the prosecutor's stewardship." United States v. Flemmi, 245 F.3d 24, 28 (1st Cir. 2001). Thus, when a grand jury proceeding results in new charges that are supported by evidence presented at that proceeding, it is typically appropriate to uphold the presumption of regularity. See id.; United States v. Scott, 784 F.2d 787, 792 (7th Cir. 1986) (per curiam) ("The subsequent indictment of [a previously unindicted individual] shows that the grand jury was not solely or predominantly used to investigate [pending charges]."); Anne Bowen Poulin, Supervision of the Grand Jury: Who Watches the Guardian?, 68 Wash. U. L.Q. 885, 908 n.80 (1990) ("[R]eturn of an indictment by the challenged grand jury will defeat the defendant's claim of improper use.").

When an abuse of the grand jury process does occur, the appropriate remedy "depends

---

[13] We recognize that several jurisdictions have adopted the "sole or dominant purpose" test for adjudicating claims of prosecutorial abuse of the grand jury process. Articulating the standard in this way, however, is unnecessarily redundant because if a grand jury proceeding with the dominant purpose of conducting discovery on pending charges is improper, then it necessarily follows that a grand jury proceeding with the sole purpose of conducting this type of discovery is also improper. Thus, to promote clarity, the standard we have adopted asks only whether the dominant purpose of the grand jury proceeding was improper.

-14-

upon when the abuse is discovered." Beale § 9:16, at 9-77. If a trial court is alerted to an abuse of process prior to a challenged grand jury proceeding, the proper remedy is to quash the offending subpoena. Id.; see also Bishop, 87 S.W.3d at 3 ("If the purpose of subpoenaing [the witnesses] before the grand jury is to use the grand jury proceedings as a guise for trial preparation, the subpoenas must be quashed." (citing In re Grand Jury Proceedings (Fernandez Diamante), 814 F.2d at 70)). If the trial court finds an abuse of process after the grand jury proceeding but before trial, the usual remedy is suppression of the improperly discovered evidence. See Flemmi, 245 F.3d at 27; United States v. Kovaleski, 406 F. Supp. 267, 271 (E.D. Mich. 1976). A claim of abuse of the grand jury process presented in a motion for a new trial or on appeal is subject to harmless error analysis. See United States v. Jenkins, 904 F.2d 549, 559-60 (10th Cir. 1990); see also Tenn. R. App. P. 36(b).

## B. Motion to Quash

Now having recognized the appropriate rule and its application at various stages of the proceedings, this Court may address the Defendant's assertion that the trial court applied the incorrect legal standard when denying her motion to quash the subpoena for A.M. to provide grand jury testimony. The Defendant maintains that the District Attorney's knowledge that A.M.'s grand jury testimony would provide inculpatory evidence against the Defendant establishes that the dominant purpose for the issuance of the subpoena was to gather information in support of the charges in the first superseding indictment. In response, the State contends that the District Attorney subpoenaed A.M. to testify before the reconvened grand jury for the legitimate purpose of considering whether to issue a second superseding indictment with new charges.

Our standard of review of a ruling on a motion to quash is whether the trial court committed an abuse of discretion. State v. Hester, 324 S.W.3d 1, 53 (Tenn. 2010). An abuse of discretion occurs when the trial court (1) applies an incorrect legal standard, (2) reaches an illogical or unreasonable decision, or (3) bases its decision on a clearly erroneous assessment of the evidence. Lee Med., Inc. v. Beecher, 312 S.W.3d 515, 524 (Tenn. 2010).

In this instance, the trial court applied the incorrect standard in its ruling on the motion to quash. Instead of adhering to the widely recognized rule that a grand jury proceeding is improper if its dominant purpose is to discover information related to pending charges in preparation for trial, the trial court fashioned a more demanding standard for demonstrating prosecutorial misconduct, denying the motion to quash because the discovery of information related to pending charges was not the "sole" purpose of the subpoena. By application of the correct standard, however, we do not hesitate to conclude that the Defendant failed to carry her burden of rebutting the presumption that the District Attorney had a legitimate dominant purpose for the issuance of the subpoena for A.M. to testify before the grand jury.

The fact that A.M.'s attorney had previously related to the District Attorney the content of her testimony suggests that the dominant purpose of the subpoena was to allow the grand jury to act on her testimony, and not to discover information of which the District Attorney was already aware. Further supporting this conclusion is the District Attorney's testimony that he could have simply offered A.M. immunity for her testimony at trial but chose instead to have her testify first before the grand jury in order to allow consideration "of additional charges being placed [and] the possibility of [adding] defendants who [the State] might not know of at this point in time."

In addition, as the District Attorney testified, the extended investigation leading up to the January 20, 2005 grand jury proceeding did, in fact, involve several "twists and turns." The members of the Mangrum family provided the police with at least three different versions of the events leading up to the murder of the victim: (1) the initial story in which the victim purportedly went to the Mangrum residence looking for pain pills on the night before the murder; (2) the narrative in which Terry Jr., possibly accompanied by Terry Sr., killed the victim and did so without any involvement by the Defendant or A.M.; and (3) the version in which the Defendant murdered the victim with the compelled assistance of Terry Jr. and A.M. These conflicting accounts frustrated the grand jury's ability to ensure that the various members of the family would be brought to trial on the appropriate charges, as indicated by the grand jury foreman's testimony that determining the appropriate charges had proved to be an exceedingly difficult task and that the grand jurors sought to learn from A.M. "[w]ho was [actually] involved in [the murder, kidnapping, and burglary] and to what extent they were involved." It is our view that the District Attorney acted within his discretion by compelling testimony from a witness with first-hand knowledge so that the grand jury could assess her credibility in determining who should be brought to trial and on what charges. See Harris, 33 S.W.3d at 771; Felts, 418 S.W.2d at 774. The fact that A.M.'s testimony resulted in a new charge of accessory after the fact against Terry Sr. further supports this conclusion. See Flemmi, 245 F.3d at 28.

In making this determination, this Court acknowledges that A.M.'s testimony before the grand jury provided a substantial collateral benefit to the State. As the District Attorney candidly conceded, compelling A.M. to testify before the grand jury produced information relevant to the pending charges against each of the defendants—inculpatory information as to the Defendant and Terry Jr., and largely exculpatory information in regard to Terry Sr. Further, A.M.'s grand jury testimony offered a preview of her trial testimony and provided a means of impeachment should she later attempt to change her account of the murder. It is well established, however, that so long as the dominant purpose of a grand jury proceeding is proper, the State is entitled to use any evidence adduced during the grand jury proceeding at trial. See Sasso, 59 F.3d at 351-52 ("Where there was some proper dominant purpose for the postindictment subpoena, . . . the government is not barred from introducing evidence

obtained thereby."); United States v. Gibbons, 607 F.2d 1320, 1328 (10th Cir. 1979) ("[W]here there is another legitimate purpose behind the grand jury investigation, the proceeding would not be improper merely because the Government may derive an incidental benefit."); Beale § 9:16, at 9-74 ("[I]t is settled that if, in the course of . . . legitimate investigative efforts, the prosecution obtains evidence that is relevant to the pending case, it can use that evidence at trial."). Here, the Defendant has not shown that the legitimate purpose of the January 20, 2005 proceeding—presenting A.M.'s testimony to assist the grand jury in its duties—was subservient to any investigation of the pending charges against her. Therefore, the incidental benefits to the State in the form of discovery do not, under these circumstances, establish that the trial court should have granted the motion to quash, even if it had applied the correct legal standard.

### C. Motions to Suppress and Dismiss

In a closely related issue, the Defendant next argues that following the January 20, 2005 grand jury proceeding during which A.M. provided her testimony, the trial court erred by denying her motions to suppress any trial testimony by A.M. and to dismiss all pending indictments. According to the Defendant, the inculpatory nature of A.M.'s testimony with regard to the pending charges against the Defendant substantiates her claims.

When the trial court makes findings of fact after a motion to suppress, its conclusions are binding upon this Court unless the evidence in the record preponderates otherwise. See State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). As a general rule, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." Id. When the findings of fact are based entirely on evidence that does not involve issues of witness credibility, an appellate court conducts a de novo review. State v. Binette, 33 S.W.3d 215, 217 (Tenn. 2000). Review of a trial court's application of law to the facts is de novo with no presumption of correctness. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001) (citing State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999)). We review a trial court's ruling on a motion to dismiss an indictment under the abuse of discretion standard. Harris, 33 S.W.3d at 769-70.

As with the motion to quash, the Defendant's claims pertaining to her subsequent motions to suppress and dismiss are without merit. Consistent with his previous testimony, the grand jury foreman stated at the hearing on the motions to suppress and dismiss that the grand jury had reconvened to hear testimony from A.M. because the jurors "felt there was additional information needed in order to find out exactly what occurred." Based upon the new information provided by A.M., the grand jury issued a second superseding indictment adding a new charge of accessory after the fact against Terry Sr., which is highly probative of the legitimacy of the purpose of the grand jury proceeding. See Flemmi, 245 F.3d at 28;

Scott, 784 F.2d at 792. Moreover, the new accessory after the fact charge against Terry Sr. was consistent with A.M.'s grand jury testimony that Terry Sr. did not participate in the murder but discussed it with the Defendant upon her return to their residence. Eventually, Terry Sr. pled guilty to the charge of accessory after the fact, and the State voluntarily dismissed the remaining charges against him.

The circumstances surrounding the grand jury testimony in this case are in stark contrast to those in the "very few" cases in which courts have found an abuse of the grand jury process predicated upon improper trial preparation. Beale § 9:16, at 9-76. In a Second Circuit Court of Appeals case, for example, the prosecutor initially subpoenaed a witness to produce evidence at an upcoming trial. In re Grand Jury Subpoena Duces Tecum Dated Jan. 2, 1985 (Simels), 767 F.2d 26, 28 (2d Cir. 1985). After the trial subpoena proved ineffective, the witness "received a grand jury subpoena seeking the very same materials described in the trial subpoena." Id. The court reasoned that these circumstances showed that the dominant purpose of the grand jury subpoena was to conduct discovery in preparation for the upcoming trial, and that the prosecutor's stated purpose for the subpoena—to obtain evidence "relevant to the grand jury's investigation, such as the identification of co-conspirators"—was subservient to the dominant purpose of "pretrial preparation." Id. at 29-30. Similarly, in In re National Window Glass Workers, prosecutors attempted to use grand jury subpoenas to obtain testimony and other evidence relevant to pending charges involving an alleged price-fixing conspiracy. 287 F. 219, 221-22 (N.D. Ohio 1922). The prosecutors claimed that the evidence could support a new indictment, but the district court found this assertion to be pretextual in light of the prosecutors' stated desire to immediately try the defendants on the pending indictment and "not to try anybody on a new indictment, except in a remote future contingency." Id. at 223-24; see also In re Matter of Grand Jury Subpoenas Issued May 3, 1994 for Nash, 858 F. Supp. 132, 135-36 (D. Ariz. 1994) (sustaining objection to the timing of grand jury subpoenas seeking testimony of attorneys regarding fees paid by clients against whom drug charges were pending); Bishop, 87 S.W.3d at 4 (reversing determination that no grand jury abuse had occurred and remanding for an evidentiary hearing where the trial court had refused the defendant's request to question the prosecutor as to the purpose of the challenged grand jury proceeding).

Unlike these few cases in which the grand jury either had been or may have been used for an improper purpose, the Defendant did not demonstrate in this instance that the legitimate purpose for the grand jury proceeding offered by the State—to present the testimony of A.M. to assist the grand jury's assessment of what charges to bring in a possible superseding indictment—was either pretextual or subservient to the purpose of preparing for trial on the pending charges. In our view, the Defendant failed to overcome the presumption of regularity by establishing that the dominant purpose of the proceeding was to discover facts related to the pending charges for use at trial. Given the totality of the relevant

circumstances, particularly the fact that Terry Sr. was appropriately charged with an additional count of accessory after the fact as a consequence of the January 20, 2005 proceeding, the trial court, in our assessment, did not err by denying the Defendant's motion to suppress and motion to dismiss.[14]

### III. Conclusion

In summary, the Defendant failed to demonstrate that the District Attorney acted improperly by compelling the testimony of A.M. in the January 20, 2005 grand jury proceeding, and the trial court properly denied the motions by the Defendant alleging prosecutorial abuse of the grand jury process. The judgment of the Court of Criminal Appeals is, therefore, affirmed. It appearing that the Defendant is indigent, costs are adjudged against the State.

_____
GARY R. WADE, CHIEF JUSTICE

---

[14] The Defendant additionally asserts that the District Attorney's purported misconduct resulted in a denial of her right to due process and violated "principles of fundamental fairness." Of note, the Defendant provides no authority suggesting that her claims are of constitutional magnitude. In any event, having determined that the District Attorney did not abuse his discretion in this case, we need not address whether an abuse of the grand jury process may result in the deprivation of a defendant's right to due process or any other constitutional right. See State v. Taylor, 70 S.W.3d 717, 720 (Tenn. 2002) ("[C]ourts do not decide constitutional questions unless resolution is absolutely necessary to determining the issues in the case and adjudicating the rights of the parties.").