FILED
08/14/2020
Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 15, 2020

**STATE OF TENNESSEE v. ANDY F. NUNEZ**

**Appeal from the Criminal Court for Davidson County
No. 2016-D-1972      Steve R. Dozier, Judge**

_____

**No. M2019-00473-CCA-R3-CD**

_____

Andy F. Nunez, Defendant, and two co-defendants, Joseph Santillan and Daniela Cruz, were indicted for first degree murder, felony murder, attempted especially aggravated robbery, attempted aggravated robbery, and reckless endangerment after a Nashville visitor was shot and killed while walking with his friend in September of 2016. Prior to trial, the State entered into a use immunity agreement with co-defendant, Ms. Cruz. Her case was severed from Defendant's and Mr. Santillan's case and she ultimately testified for the State. Prior to trial, counsel for Defendant subpoenaed the ten most recent use immunity agreements in first degree murder cases where a testifying co-defendant's indictment was severed and the case proceeded to final judgment. The State filed a motion to quash the subpoena. The trial court granted the motion. The case proceeded to trial. Based partly on co-defendant Cruz's testimony, Defendant was convicted as charged. He received an effective sentence of life plus five years. After trial, Ms. Cruz entered into a plea agreement to a reduced charge. On appeal, Defendant argues that the trial court abused its discretion by granting the motion to quash the subpoena. After a review, we determine that the trial court did not abuse its discretion and we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., J., joined. THOMAS T. WOODALL, J., filed a separate opinion concurring in results only.

Wesley Clark, Nashville, Tennessee, for the appellant, Andy F. Nunez.

Herbert H. Slatery III, Attorney General and Reporter; James E. Gaylord, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and J. Wesley

King, Kate Melby and Chandler Harris, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

In October of 2016, the Davidson County Grand Jury indicted Defendant, Mr. Santillan, and Ms. Cruz for first degree murder, felony murder, attempted especially aggravated robbery, attempted aggravated robbery, and reckless endangerment for events that took place in downtown Nashville on September 25, 2016, and resulted in the death of Theodore Grasset and the attempted robbery of Larry Niehues.

Prior to trial, the State entered into a use immunity agreement with Ms. Cruz in exchange for a May 17, 2018 statement. According to the agreement, the District Attorney agreed not to use the statement against Ms. Cruz in any criminal proceeding "unless [s]he should testify differently under oath as to any material facts contained in the statement." The use immunity agreement was silent as to whether Ms. Cruz would receive a plea agreement or reduced sentence in exchange for her statement. The case against Ms. Cruz was severed from Defendant and Mr. Santillan prior to trial. The State also gave notice that she would be a potential State witness at Defendant's trial.

In November of 2018, counsel for Defendant served a subpoena on the State, seeking the ten most recent use immunity agreements, negotiated plea agreements, judgments, and "any other documents in the possession of the [State] which reflect any case dispositions or agreements made by the [State]" "looking back from October 17, 2018," where the person was:

> a. A Co-[d]efendant in a criminal indictment for First Degree Murder, *and*
> > i. Whose indictment was severed from their co-defendant(s), *and*
> > ii. Who testified in the trial or trials of that person's co-defendant(s); *and*
> > iii. Whose indictment(s) above described have Judgments (alternatively described as "final orders" within the meaning of the Tennessee Rules of Appellate Procedure) entered as on October 17, 2018.

In response to the subpoena, the State filed a motion to quash the subpoena, arguing that it was unreasonable, oppressive, and did not seek material evidence. At the hearing, counsel for Defendant argued that the State had a "routine practice" of "making

deals" in exchange for testimony on "a wink and a nod." Counsel for the Defendant argued that the documents obtained from the subpoena would show a pattern of leniency by the State with regard to eventual disposition of cases in which a defendant signed a use immunity agreement. In turn, counsel for Defendant would be able to establish bias on the part of Ms. Cruz and prove that her testimony was somehow unreliable because she was going to receive a lesser sentence or conviction based on her testimony.

At the conclusion of the hearing, the trial court granted the motion to quash the subpoena. The trial court was "not convinced [that] the request [wa]s even relevant, but if relevant under 401, it would have very minimal probative value and certainly . . . the probative value is not going to substantially outweigh the confusion of the issues, misleading the jury, undue delay, making this trial into a trial of every other use immunity agreement." Additionally, the trial court determined that this was not the "type of 406 habit evidence that's routine and so automatic that . . . it's the same in every situation." The trial court noted that counsel for Defendant would be permitted to "grill, cross-examine" Ms. Cruz at trial about what she "expect[ed] to get from her testimony" at trial and that "would be ample information for the jury about her bias and what she hopes to obtain without introducing the requested information under the subpoena." Lastly, the trial court commented that counsel for Defendant could probably get the information sought by the subpoena from the clerk or the jury coordinator.

At trial, Ms. Cruz provided a detailed account of the events leading up to Mr. Grasset's death. The State put forth proof that Ms. Cruz and Defendant were dating and living together in September of 2016. Ms. Cruz and Defendant had known each other for a few months at the time. On the day of the incident, Ms. Cruz, Defendant, Mr. Santillan, Sami Krasniqi, and Michelle Rogers[1] were all at an apartment in Antioch. Ms. Cruz had known Mr. Krasniqi since she was fourteen years old and had known Ms. Rogers for a few months. Mr. Krasniqi proposed that the group burglarize the home of one of his relatives to steal the contents of a safe.

At the time, Mr. Santillan drove a grey Chevrolet Impala. The Impala was equipped with a distinctive blue light near the license plate. Mr. Santillan and Mr. Krasniqi tried to remove the blue light from the license plate area prior to the planned burglary. They were unsuccessful. The group left the apartment, travelling in the Impala and another car toward the address of the proposed burglary. Once they arrived, Mr. Krasniqi tried to get Defendant, Mr. Santillan, and Ms. Cruz to enter the house. They declined. The group split up with Ms. Cruz, Mr. Santillan, Ms. Rogers, and Defendant leaving in the Impala. They stopped at several different locations before finally driving toward downtown Nashville.

---

[1] Ms. Rogers died prior to trial.

Ms. Cruz was driving when they arrived downtown, and Defendant was seated in the passenger seat. Ms. Rogers was in the back seat behind Ms. Cruz; Mr. Santillan was in the back seat behind Defendant. Defendant told Ms. Cruz to drive down Broadway. Ms. Cruz made a wrong turn. Defendant was angry with Ms. Cruz, corrected her, and told her where to drive. Ms. Cruz drove to Fourth Avenue South near the Country Music Hall of Fame. Defendant instructed her to stop the car on the street near Mr. Grasset and Mr. Niehues, who were walking on the sidewalk.

Defendant and Mr. Santillan got out of the car. Defendant was wearing some type of face covering. He yelled at Mr. Grasset and Mr. Niehues to stop walking. Instead of complying with Defendant's demand, the men ran. Mr. Grasset ran back toward Broadway, and Mr. Niehues ran into an alley. Defendant shot Mr. Grasset as he ran away. Mr. Grasset fell to the ground and was able to get back up and run a short distance before collapsing. Defendant and Mr. Santillan returned to the Impala. Defendant got in the back seat and Mr. Santillan got in the front seat. Ms. Cruz drove the car out of town, heading south on I-65. When they arrived at the trailer where Defendant and Ms. Cruz were living, Mr. Santillan and Ms. Rogers left in the Impala.

Surveillance cameras at a loading dock near the scene captured the shooting. The video footage showed the Impala with the distinctive blue light. The Impala stopped and two men exited the vehicle. One of the men wore a mask and the other man wore a white baseball cap with a black bill. Police initially released limited images from the surveillance cameras; they specifically refrained from releasing images of the blue light at the license plate of the vehicle.

On October 1, Ms. Cruz and Defendant left Nashville for North Carolina. Police were able to identify Mr. Santillan as the owner of the vehicle in early October and by mid-October, located the vehicle. The blue light, front and rear bumpers, and spoiler had been removed. Police also executed a search warrant at Mr. Santillan's home, where they found a white hat with a black bill consistent with the hat worn by one of the men in the surveillance video. Police recovered Mr. Santillan's cell phone from his employer. The cell phone had been placed in a toilet tank at a construction site in Franklin.

By mid-October, police had identified Ms. Rogers and Ms. Cruz as suspects. Police interviewed Ms. Cruz's mother, Mary Cruz. Mrs. Cruz told police that she was able to identify Defendant from the surveillance video because she bought the pants he was wearing. She also recognized his gait. She identified Defendant as her daughter's boyfriend. Mrs. Cruz called her daughter. Ms. Cruz promised her mother that she would return to Nashville to assist with the investigation. Instead, Ms. Cruz bought bus tickets

to Brownsville, Texas for herself and Defendant under different names. Ms. Cruz and Defendant were eventually arrested in late October in Raleigh, North Carolina.

During her initial interview with police, Ms. Cruz was not forthcoming. Eventually, she gave police an account of the events that took place on the night of the shooting, including pieces of information about the incident that the police had not yet released to the public. Police analyzed Ms. Cruz's cell phone. Forensic analysis of location data from her cell phone was consistent with her account of the events.

During her testimony at trial, Ms. Cruz was questioned about her use immunity agreement. She stated that she had not been promised anything for her testimony but acknowledged that she hoped to get a reduced charge and lesser sentence. On cross-examination, Ms. Cruz denied that her lawyer told her testifying would be a good way to get a favorable resolution to her case. Ms. Cruz claimed that she also testified to get closure for the events that took place.

At the conclusion of the proof, Defendant was found guilty as charged in the indictment on all counts. The trial court merged the conviction for felony murder with the conviction for first degree murder. After a sentencing hearing, Defendant was sentenced to an effective sentence of life plus five years. Defendant filed a motion for new trial in which he challenged the trial court's grant of the motion to quash the subpoena. The trial court denied the motion for new trial. This appeal followed.

*Analysis*

On appeal, Defendant argues that the trial court abused its discretion in quashing the subpoena, and effectively violated Defendant's rights under the Confrontation Clause. The State disagrees, arguing that subpoenas are governed not by the Confrontation Clause, but by the compulsory process clause. Moreover, the State argues, the trial court properly quashed the subpoena.

Under both our state and federal constitutions, a defendant has the right to compulsory process for obtaining witnesses in their favor. *See* U.S. Const. amend VI; Tenn. Const. art. I, § 9; T.C.A. § 4-17-105. The United States Supreme Court discussed the implications of this right as follows:

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the

purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

*Washington v. Texas*, 388 U.S. 14, 19 (1976). "Although an accused in a criminal trial has a constitutional right to the compulsory attendance of witnesses under the Sixth Amendment of the United States Constitution, and Article I, Section 9, of the Constitution of Tennessee, the right to compulsory process is not unlimited." *State v. Smith*, 639 S.W.2d 677, 680 (Tenn. Crim. App. 1982). The court continued:

"A court is not required to issue compulsory process for anyone whom accused may designate as a witness; the constitutional right to compulsory process requires such process for, and only for, competent, material, and resident witnesses whose expected testimony will be admissible. Within these limitations[,] accused may obtain the attendance of any witnesses he cares to use."

*Id.* (quoting *Bacon v. State*, 385 S.W.2d 107, 109 (1964)).

The subpoena in this case was issued pursuant to Rule 17 of the Tennessee Rules of Criminal Procedure, which rule provides that "[a] subpoena may order a person to produce the books, papers, documents, or other objects the subpoena designates" either "in court before trial or before they are to be offered in evidence." Tenn. R. Crim. P. 17(d)(1). "On motion made promptly and in any event by the time specified in the subpoena for compliance therewith, the court may quash or modify the subpoena if compliance would be unreasonable or oppressive." Tenn. R. Crim. P. 17(d)(2). "The rule . . . is the unlimited right of subpoena[,] limited only by authority to quash upon a showing (by the objector) that the witness has no information material to the issues or that the evidence sought is equally immaterial." *State v. Womack*, 591 S.W.2d 437, 445 (Tenn. Ct. App. 1979). On appeal, we review a trial court's ruling on a motion to quash a subpoena with an abuse of discretion standard. *State v. Mangrum*, 403 S.W.3d 152, 166 (Tenn. 2013) (citing *State v. Hester*, 324 S.W.3d 1, 53 (Tenn. 2010)). A trial court can abuse its discretion by applying an incorrect legal standard, reaching an illogical or unreasonable decision, or basing its decision on a clearly erroneous assessment of the evidence. *Id.*

As explained above, Defendant in this case sought the ten most recent use immunity agreements, negotiated plea agreements, judgments, and "any other documents in the possession of the [State] which reflect any case dispositions or agreements made by the [State]" since October 17, 2018, where the person was:

a.  A Co-[d]efendant in a criminal indictment for First Degree Murder, *and*

i.  Whose indictment was severed from their co-defendant(s), *and*

ii.  Who testified in the trial or trials of that person's co-defendant(s); *and*

iii.  Whose indictment(s) above described have Judgments (alternatively described as "final orders" within the meaning of the Tennessee Rules of Appellate Procedure) entered as on October 17, 2018.

(emphasis in original).  Defendant sought this information to "demonstrate a pattern or practice of the Davidson County District Attorney's Office whereby the DA severs one of the co-defendants in a homicide indictment, presents the witness for testimony, and only after the trial is complete, 'solidifies' a plea deal which results in a significantly reduced charge to the testifying, severed co-defendant."  Defendant argues on appeal that the trial court improperly quashed the subpoena in part because the State's pattern of favorable treatment could have indicated bias on behalf of Ms. Cruz that Defendant could have exposed at trial.

At the conclusion of the hearing on the motion to quash, the trial court determined that the information sought by the subpoena was probably not even relevant to Defendant's case and/or Ms. Cruz's bias but, even if relevant, would have "minimal" probative value that did not "outweigh the confusion of the issues, misleading the jury, undue delay, making this trial into a trial of every other use immunity agreement."  The trial court noted counsel for Defendant would be given the opportunity to "grill, cross-examine" Ms. Cruz about what she "expects to get from her testimony" at trial and that the jury would be able to use that information to determine whether the witness was biased in favor of the State.  Moreover, the trial court determined that allowing Defendant to introduce information about ten other cases would essentially result in mini-trials of the underlying facts of each of those cases.  Lastly, the trial court commented that counsel for Defendant could probably get the information sought by the subpoena from the clerk or the jury coordinator.  At trial, counsel for Defendant asked Ms. Cruz what she "expect[ed] . . . to get for her testimony."  Ms. Cruz initially stated that she hoped to get some consideration from the State in exchange for her testimony but later claimed that she spoke to the State "for closure."  When questioned by counsel for the State, Ms. Cruz acknowledged that her desire for favorable treatment from the State was "one of the reasons, but . . . not the main reason" she testified at trial.  Ms. Cruz admitted that she did not have any formal agreement with the State.  After Defendant's trial, Ms. Cruz pled guilty to facilitation of second degree murder.  For her guilty plea, she received a sentence of fifteen years as a Range I, standard offender.

- 7 -

Defendant argues on appeal that his right to confront the witness was limited in violation of the Sixth Amendment. We acknowledge that a defendant has the right to examine witnesses to impeach their credibility or to establish that the witnesses are biased, including the right to examine a witness regarding any promises of leniency, promises to help the witness, or any other favorable treatment offered to the witness. *See State v. Smith*, 893 S.W.2d 908, 924 (Tenn. 1994); *see also State v. Spurlock*, 874 S.W.2d 602, 617 (Tenn. Crim. App. 1993). As Defendant notes, an undue restriction of this right may violate a defendant's right to confrontation under the Sixth Amendment of the United States Constitution and Article I, Section 9, of the Tennessee Constitution. *See Smith*, 893 S.W.2d at 924; *see also State v. Black*, 815 S.W.2d 166, 177 (Tenn. 1991). Here, the record establishes that Defendant was able to question and alert the jury as to Ms. Cruz's motivation for testifying. Ms. Cruz was asked why she was testifying for the State and whether she received the promise of leniency in exchange for her testimony. Defendant was not prohibited or limited in his questioning.

Defendant also argues that the trial court applied the improper standard, quashing the subpoena "without regard to whether the compliance would be unreasonable or oppressive, as required by the rule." We disagree. The trial court quashed the subpoena because the information sought was irrelevant and, even if relevant, minimally probative to establish bias. *See Womack*, 591 S.W.2d at 445 (noting that information sought by subpoena must be material to the issues or evidence sought); *State v. Tony Click*, No. 162, 1991 WL 188882, at *2 (Tenn. Crim. App. Sept. 26, 1991) ("Where there is no record showing that testimony would have been helpful to [a defendant], there is no abuse of discretion in denying a motion to subpoena defense witnesses."). In our view, the trial court used the proper standard. Moreover, the trial court did not abuse its discretion in quashing the subpoena. Defendant is not entitled to relief on this issue.

*Conclusion*

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
TIMOTHY L. EASTER, JUDGE