IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 25, 2023

**STATE OF TENNESSEE v. JERRY L. DISMUKES**

**Appeal from the Criminal Court for Knox County**
**No. 117603   G. Scott Green, Judge**

_____

**No. E2022-01517-CCA-R3-CD**

_____

A Knox County jury convicted Defendant, Jerry L. Dismukes, of possession of more than fifteen grams of heroin with intent to sell or deliver; possession of less than 200 grams of fentanyl with intent to sell or deliver; possession of more than twenty-six grams of a substance containing cocaine with intent to sell or deliver; and possession of drug paraphernalia.  On appeal, Defendant argues that the trial court provided the improper remedy when it modified one of his convictions to a lesser offense after the jury's verdict.  Defendant also argues that there was insufficient evidence to prove an unbroken chain of custody.  The State argues that Defendant waived his first argument, and that the evidence was sufficient to establish an unbroken chain of custody.  We agree with the State.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

MATTHEW J. WILSON, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and TOM GREENHOLTZ, JJ., joined.

Gerald L. Gulley, Jr., Knoxville, Tennessee, for the appellant, Jerry L. Dismukes.

Jonathan Skrmetti, Attorney General and Reporter; Abigail H. Rinard, Assistant Attorney General; Charme P. Allen, District Attorney General; and Mitch Eisenberg, Assistant District Attorney General, for the appellee, State of Tennessee.

OPINION

I. Factual and Procedural History

A Knox County Grand Jury returned a six-count indictment charging Defendant with a number of drug offenses.  Count 1 alleged Defendant "did unlawfully and knowingly possess with intent to sell or deliver a Schedule I controlled substance, to-wit: Heroin in an

amount of more than fifteen [] grams . . . ."  Count 2 alleged Defendant "did unlawfully and knowingly possess with intent to sell or deliver a Schedule II controlled substance, to-wit: Fentanyl in an amount less than [] [200] grams . . . ."  Count 3 alleged Defendant "did unlawfully and knowingly possess with intent to sell or deliver a Schedule II controlled substance, to-wit: more than twenty-six [] grams of a substance containing Cocaine . . . ."  Count 4 alleged Defendant maintained a place to keep controlled substances, Count 5 alleged he maintained a place to sell controlled substances, and Count 6 alleged he possessed drug paraphernalia.

## A. Trial

In October 2019, Khristian Pickett,[1] a narcotics investigator for the Knox County Sheriff's Office, learned that Anna Vandergriff and another individual were selling narcotics out of a house at 3416 Oak Grove Street, in Knox County.  Investigator Pickett surveilled the house and conducted several controlled buys using a confidential informant to purchase drugs.  He observed multiple vehicles and individuals approach the house.  The investigator frequently observed Ms. Vandergriff exit the house, get into the vehicles, stay there for short time periods—between three and thirty minutes—and go back inside.  Other times, individuals who had either driven up or walked to the house would go into the house and stay a similarly short time period.  The investigator explained that this activity was consistent with narcotics sales.  He identified at least one of the individuals he observed as a person he knew was involved in narcotics sales.

Investigator Pickett then obtained a warrant to search the house.  On October 29, 2019, Detective John Sharp, another narcotics investigator with the Knox County Sheriff's Office, assisted Investigator Pickett and other officers in executing the warrant.  When officers searched the house, they found Ms. Vandergriff, Defendant, and several other individuals inside.  Investigator Pickett found Ms. Vandergriff and a female named Donna Cummings inside Ms. Vandergriff's bedroom.  In that bedroom, the officers found two sets of digital scales, multiple cell phones, torn paper used to package narcotics, and about a gram of heroin.  Officers also found a tourniquet, used needles, and syringes; items which drug users employ to inject drugs intravenously.  This led them to believe that drugs were not just being sold out of the house, but that people also were coming to the house to use drugs.

Investigator Pickett opined that a single dose of heroin would be approximately one-tenth of a gram.  He stated that a gram of heroin would typically cost between $75 and

---

[1] Investigator Pickett was qualified by the trial court as an expert in narcotics investigation, identification, and valuation.

$100, and an ounce of heroin would cost approximately $1400. He stated that those who sell heroin would typically purchase and possess an "eight ball," or approximately 3.5 grams or more at a time, and that possession of a gram of heroin was consistent with personal use.

Officers found Defendant in a separate bedroom and discovered about ten grams of suspected heroin hidden inside tires, razors, at least one digital scale, drug packaging materials, a mirror with powder residue on it, and four cell phones.[2] Officers also found a suitcase that contained a cell phone bill addressed to Defendant in the room. Investigator Pickett surmised that Defendant's room was where the narcotics "were being cut up and packaged for resale" because of the packaging materials and the residue on the mirror as well as other surfaces. After conducting their investigation, officers believed that Ms. Vandergriff and Defendant lived at the house, but that the other people they found in the house did not live there.

Officers eventually took Defendant and the others outside. When officers began to search Defendant's person, he "defecated on himself" while making "[s]light grunts and laughing." This hindered officers' ability to fully search Defendant, so they secured him in a chair and resumed their search inside the house. Anthony Wallace, a transportation officer with the Knox County Sheriff's Office, arrived at the scene later than other officers. Officer Wallace found Defendant "sitting in a chair" outside and "escorted him to the wagon." When Officer Wallace went to pat Defendant down, Defendant "started bending over and yelling." Officer Wallace believed Defendant "was trying to sidetrack [him] from the search," but he continued searching Defendant. When Officer Wallace searched Defendant's midsection, Defendant started "doubling over," but the officer felt an object in Defendant's pants and removed it. Officer Wallace testified the object was "hard wrapped . . . kind into a ball . . . about the size of a baseball."[3] Officer Wallace gave the object to one of the narcotics investigators and took Defendant to the detention facility.

After unwrapping the baseball-sized object, investigators discovered it contained approximately forty-two grams of suspected heroin, twenty-eight grams of suspected crack cocaine, and thirty grams of suspected powder cocaine. Investigator Pickett noted that "[e]verything was packaged separately" which led him "to believe that [it was] going to be for resale." Investigator Pickett and Detective Sharp double bagged each of the suspected narcotics packages found on Defendant's person in three separate exhibits with a fourth exhibit containing narcotics found in the house, labeled them, placed them in a manila

---

[2] During the execution of the search, some of the cell phones were receiving calls from Michigan, a source state for heroin and fentanyl ultimately distributed in Knox County.

[3] Officers also found $1,684 cash on Defendant, who admitted to being unemployed.

envelope and then into outer plastic packaging, which they heat sealed. The exhibits then were sent to the Tennessee Bureau of Investigation (TBI) crime laboratory for testing.

During trial, Detective Sharp testified that the evidence inside the envelope was the evidence found at the crime scene. The detective testified that the sample labeled "A" was from Defendant's bedroom, and the samples labeled "C," "D," and "E" were from Defendant's person. The detective testified that once he sealed and marked the envelope, he either gave it to the evidence custodian or placed it in a secured locker.

Investigator Pickett identified the narcotics that were provisionally introduced into evidence as Exhibit 3. The following exchange occurred between the investigator, the parties, and the trial court:

| State: | I'm handing you what's been pre-marked as Exhibit [Number] 3. Do you recognize this package? |
|---|---|
| Inv. Pickett: | Yes, sir. |
| State: | Is that the drugs that were submitted by your office to TBI in this case? |
| Inv. Pickett: | Yes, sir. |
| State: | Your Honor, I'd offer this as Exhibit [Number] 3 and I'd ask that it be introduced into evidence. |
| Trial Court: | All right. Well, let's—you can go ahead and introduce it absent objection as Exhibit [Number] 3 once—are you contesting the chain of custody to TBI? |
| Defense Counsel: | No, Your Honor. But I would ask that the toxicology report be removed and be admitted separately. |
| Trial Court: | Well, we're not going to do anything with it until TBI completes the chain of custody. |
| Defense Counsel: | I understand, Your Honor. |

Investigator Pickett testified that the narcotics were packaged just as they were when they were sent to the TBI. At the request of the State, the investigator opened the envelope in court and displayed the narcotics for the jury.

Lori James, an evidence technician with the TBI at the Knoxville Crime Laboratory, received the sealed manila envelope. Ms. James never opened the envelope, and explained that any issues with the evidence, such as the chain of custody, would have been documented and addressed near the time said issues were discovered. Ms. James stated, "We try to verify that everything matches the paperwork versus the bag before we take it in." Ms. James told the jury that she checked the seals on packages when the agency received them, but the envelope "was not like this when we received it. We wouldn't have accepted it in that condition." When asked specifically whether there were any problems with the chain of custody, Ms. James said that "[e]verything matche[d]."

Special Agent Hannah Peterson, a forensic chemist with the TBI, received the suspected narcotics for testing.[4] She also testified that there were no inconsistencies in the chain of custody. Agent Peterson tested two of the substances and found one bag held "31.18 grams of a white and brown rocklike substance that contained heroin and fentanyl." She admitted she did not test the substance for purity, so she could not identify "how much heroin versus fentanyl was in the mixture." Agent Peterson discovered that a second bag contained 27.76 grams of cocaine. She testified that she did not test samples "A," "B," and "D."

After the State's last witness, but before it rested its case, the State formally moved Exhibit Number 3 (the narcotics) into evidence based on proving the chain of custody, and Defendant objected to the exhibit's admission. The following exchange occurred between defense counsel and the trial court:

| Trial Court: | As I recall the testimony, Detective Sharp—[Investigator] Pickett and Detective Sharp both testified that they were present and either seized the evidence in question and/or witnessed its seizure. Detective Sharp testified that the evidence that's contained within the envelope he personally sealed up—sealed the envelope and initialed. The TBI evidence tech testified that she received that sealed envelope and would not have received it had there been a problem. So it was sealed. It was in that condition when the chemist—forensic chemist examined the same and identified the substances. Why has the chain of custody not been proven? |
|---|---|

---

[4] Special Agent Peterson was qualified as an expert in forensic chemistry.

Defense Counsel:    Judge, initially, at first blush I thought the concern would be over the fact that [Investigator] Pickett did not put it into evidence and that we needed [Detective] Sharp to come to verify how it was packaged and how it was sent. And then we get to his testimony and he's unclear about the endgame, the end result of how he put that either into an evidence locker or whether it was turned over to a technician. And I think at that point in time it becomes—the picture becomes much more fuzzy for us about the chain of custody going forward from there to the TBI.

Trial Court:    Well, here's the test. . . . [I]s the evidence what it purports to be[?] It's a question of authentication. Is there sufficient proof within the record that identifies what is being offered by the proponent of the evidence, in this instance the State of Tennessee, that it in fact is what they propose that it is. And there is. I mean, the testimony is through the testimony of [Investigator] Pickett and [Detective] Sharp that the evidence was seized, the specific evidence that they both identified as being in the smaller clear plastic bags, that they seized it. Detective Sharp testified that he marked each of those bags. He put them in the bigger manila envelope. He sealed it. And whether it went to the back of a patrol cruiser or into the evidence locker at the Sheriff's Department before it was ultimately taken to the TBI, Detective Sharp has testified that that was his sealed envelope that he initialed the seal that TBI received. And TBI said it had not been altered or they would not have accepted the evidence. The chain of custody has been established. I mean, it's quite frankly been proven much more vigorously in this case than it normally is. All right. The [c]ourt notes your objection. The [c]ourt respectfully overrules the same. The evidence is admitted within the record.

At the close of the State's proof, Defendant moved for a judgment of acquittal under Tennessee Rule of Criminal Procedure 29, arguing that the proof was insufficient on all counts. As to Count 1, Defendant argued that the State's proof, specifically Agent Peterson's testimony, showed that the heroin was not tested for purity, and therefore, the

State had not proven the threshold amount of more than fifteen grams of heroin. The court granted the Rule 29 motion for Counts 4 and 5, charging Defendant with maintaining a dwelling for keeping and selling controlled substances. The court announced it had reservations as to Count 1 because the heroin was not tested for purity. The court noted that in Count 1, the State did not charge "'a substance containing heroin'—just like [it] did down here in Count [3]." As to Count 3, the court found the language charged "more than [twenty-six] grams of a substance containing cocaine. . . . [T]hat's the specific language from the statute." The trial court announced it would submit the charge to the jury, but if the jury convicted on Count 1, the court would reassess the verdict on that count in light of the indictment's language. The court denied Defendant's Rule 29 motion for the remaining counts.

In Defendant's case-in-chief, he offered two exhibits into evidence, which were judgments relating to Ms. Vandergriff's convictions for drug offenses from the same incident. Defendant presented no further proof and elected not to testify. After deliberations, the jury convicted Defendant in Count 1 of possession of more than fifteen grams of heroin with intent to sell or deliver, in Count 2 of possession of less than 200 grams of fentanyl with intent to sell or deliver, in Count 3 of possession of more than twenty-six grams of cocaine with intent to sell or deliver, and in Count 6 of possession of drug paraphernalia.

At Defendant's sentencing hearing, the State conceded there was insufficient proof to sustain a verdict for Count 1, Defendant's conviction for possession of more than fifteen grams of heroin with intent to sell or deliver, but argued there was sufficient proof to sustain a conviction for the lesser-included offense of possession of heroin with intent to sell or deliver. The State informed the trial court that Defendant would remain convicted of a Class B felony as to Count 1, but "[t]he only difference . . . would be as to the effective fine." The trial court sentenced Defendant, as a Range I standard offender, to eleven years in Count 1 and Count 3, three years in Count 2, and eleven months and twenty-nine days in Count 6. The court imposed the sentences to run concurrently, for an effective eleven-year sentence of imprisonment at thirty-percent service.[5]

## B. Motion for New Trial

Defendant timely moved for a new trial, arguing that the jury's verdict was against the weight of the evidence, and that the trial court should have dismissed Counts 1 and 2 because the forensic chemist "could not specify the amount" of heroin and fentanyl "contained in the sample." At the hearing, Defendant argued that "the indictment did not charge a substance in an amount, it charged a specific substance in a specific amount."

---

[5] Defendant does not challenge the length of his sentences on appeal.

Referring to Count 1, the trial court acknowledged that there was "a question of the sufficiency of the State's evidence based on upon how the case [was] indicted." As it did at Defendant's sentencing hearing, the State stated that the specific weight of the heroin impacts "the amount of fine" the jury can impose, not the classification of felony offense.

The trial court then instructed the State to prepare "a corrected judgment, . . . finding [Defendant] guilty of the lesser[-]included offense of less than [fifteen] grams" and to "[a]ssess the minimum fines on each of these." When defense counsel asked the court to clarify, the court stated, "[The State is] going to prepare a corrected judgment finding [Defendant] guilty of the lesser offense of less than [fifteen] grams of heroin because that way there's no question about which part of the substance was heroin, which part was fentanyl." The court also noted that the lesser-included offense was still a Class B felony, but Defendant was not subject to a greater fine. Defense counsel responded, "Less than. Right." Defendant lodged no contemporaneous objection to the trial court's instruction to the State.

Ultimately, the trial court denied the motion for a new trial. It noted that because officers found Defendant with narcotics "wadded up in a ball and down the front of his pants when the officers arrest[ed] him," the proof was overwhelming and a new trial was not warranted. Defendant's timely appeal follows.

## II. Analysis

On appeal, Defendant argues that there was insufficient evidence to support his heroin conviction (Count 1) and that the trial court provided the improper remedy when it modified his conviction to a lesser offense. Defendant also argues that there was insufficient evidence to prove that the chain of custody was unbroken as to all the narcotics. The State counters that Defendant waived his first argument by failing to contemporaneously object and that he cannot establish plain error. The State also argues that the evidence was sufficient to support the finding that the chain of custody was unbroken.

## A. Improper Remedy

The jury convicted Defendant for possession of more than fifteen grams of heroin with intent to sell or deliver. This conviction related to a mixed substance of heroin and fentanyl that weighed 31.18 grams. Under Tennessee Code Annotated section 39-17-417(a)(4), "it is an offense for a defendant to knowingly . . . [p]ossess a controlled substance with intent to manufacture, deliver or sell the controlled substance." Violating "subsection (a) with respect to a Schedule I controlled substance is a Class B felony," and possession

of "[f]ifteen (15) grams or more of any substance *containing* heroin" subjects a defendant to a fine not more than $200,000. *Id.* § 39-17-417(b), (i)(1) (emphasis added). Defendant does not challenge whether he possessed fifteen grams or more of any substance *containing* heroin; instead, Defendant argues that he did not possess "[h]eroin in an amount of more than fifteen (15) grams, in violation of [Tennessee Code Annotated section] 39-17-417" as charged in the indictment.

The forensic chemist admitted that she did not test the substance for purity and thus could not determine the individual weights of heroin and fentanyl in the exhibit. At the hearing on the motion for new trial, Defendant consequently argued that "the jury was clearly speculating." The trial court attempted to correct this error by issuing a "corrected judgment finding [Defendant] guilty of the lesser-included offense of less than [fifteen] grams of heroin." Defendant did not object and now argues that this remedy was improper. The State argues that Defendant has waived this issue by failing to contemporaneously object and notes that Defendant has not requested plain error relief. The State further argues that Defendant could not establish plain error anyway. Defendant did not file a reply brief to address either of these issues. Accordingly, we agree with the State that Defendant waived this issue, and we decline to exercise plain error review.

## 1. Waiver

"When a defendant raises an issue for the first time on appeal, the issue will generally be deemed waived and will be considered only within the limited parameters of an appellate court's discretionary plain error review." *State v. Banks*, 271 S.W.3d 90, 119 (Tenn. 2008) (first citing *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005); and then citing *State v. Maddin*, 192 S.W.3d 558, 561 (Tenn. Crim. App. 2005)); *see also* Tenn. R. App. P. 36. Indeed, "[n]othing in [Rule 36] shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." Tenn. R. App. P. 36(a). And as we have previously noted, "[t]he failure to make a contemporaneous objection constitutes a waiver of the issue on appeal." *State v. Gilley*, 297 S.W.3d 739, 762 (Tenn. Crim. App. 2008).

Here, at the motion for a new trial, the trial court instructed the State to "do a corrected judgment, . . . finding [Defendant] guilty of the lesser-included offense of less than [fifteen] grams." When defense counsel asked the court to repeat its statement, the court said the State would "prepare a corrected judgment finding [Defendant] guilty of the lesser offense of less than [fifteen] grams of heroin because that way there's no question about which part of the substance was heroin, which part was fentanyl." Defense counsel responded, "Less than. Right." Defendant never objected. Because Defendant failed to contemporaneously object, we agree with the State that Defendant did waive this issue.

*See id.*; *see also State v. Thompson*, No. W2022-01535-CCA-R3-CD, 2023 WL 4552193, at *5 (Tenn. Crim. App. July 14, 2023), *no perm. app. filed*.

## 2. Plain Error

As noted, even when a defendant fails to properly preserve an issue for appeal, this court may still consider it under our "discretionary plain error review." *Banks*, 271 S.W.3d at 119; *see also* Tenn. R. App. P. 36. "When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. App. P. 36(b). Still, appellate courts are instructed to "sparingly exercise[]" this discretionary power. *State v. Bledsoe*, 226 S.W.3d 349, 354 (Tenn. 2007) (citations omitted). It is also a defendant's "burden to persuade an appellate court that the trial court committed plain error." *Id.* at 355 (citing *United States v. Olano*, 507 U.S. 725, 734 (1993)). "[A] defendant's failure to [even] request this relief weighs against any such consideration on our own." *Thompson*, 2023 WL 4552193, at *5 (citing *State v. Cornwell*, No. E2011-00248-CCA-R3-CD, 2012 WL 5304149, at *18 (Tenn. Crim. App. Oct. 25, 2012)). Finally, the State raised the possibility of waiver in its response brief. However, despite being on notice of a waiver issue, Defendant did not respond to this argument in a reply brief or otherwise. "Where a defendant fails to respond to a waiver argument, only particularly compelling or egregious circumstances could typically justify our *sua sponte* consideration of plain error." *Id*. Defendant is, therefore, not entitled to relief on this issue.

## B. Chain of Custody

As to his second issue, Defendant argues that "there was insufficient evidence to support the convictions based on the State's failure to prove chain of custody." Specifically, Defendant claims that because Detective Sharp could not remember whether he gave the sealed evidence to an evidence custodian or placed it in an evidence locker, "there is a critical link missing in the chain of custody." Defendant also argues that Lori James, an evidence technician with the TBI, testified that there was a problem with the seal and that it had been opened by someone else. The State argues that "[w]itness testimony established an unbroken chain of custody." We agree with the State.

This court reviews chain of custody challenges under an abuse of discretion standard. *State v. Cannon*, 254 S.W.3d 287, 295 (Tenn. 2008) (first citing *State v. Scott*, 33 S.W.3d 746, 752 (Tenn. 2000); and then citing *State v. Beech*, 744 S.W.2d 585, 587 (Tenn. Crim. App. 1987)). A reviewing court should uphold a trial court's ruling unless the trial court "applies an incorrect legal standard, . . . reaches an illogical or unreasonable decision, or . . . bases its decision on a clearly erroneous assessment of the evidence." *State v. Mangrum*, 403 S.W.3d 152, 166 (Tenn. 2013) (citations omitted).

Here, Tennessee Rule of Evidence 901(a) is the applicable rule, providing that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." Our supreme court has repeatedly held that "'as a condition precedent to the introduction of tangible evidence, a witness must be able to identify the evidence *or* establish an unbroken chain of custody.'" *State v. Scott*, 33 S.W.3d 746, 760 (Tenn. 2000) (emphasis added) (quoting *State v. Holbrooks*, 983 S.W.2d 697, 701 (Tenn. Crim. App. 1998)); *see also Cannon*, 254 S.W.3d at 296. The chain of custody rule "is designed to insure 'that there has been no tampering, loss, substitution, or mistake with respect to the evidence." *Id.* (quoting *State v. Braden*, 867 S.W.2d 750, 759 (Tenn. Crim. App. 1993)). Although the State should sufficiently establish each "link" in the chain of custody, it is not required to prove the identity of tangible evidence "beyond all possibility of doubt." *Cannon*, 254 S.W.3d at 296. The State need not exclude every possibility of tampering, and an "item is not necessarily precluded from admission . . . if the State fails to call all of the witnesses who handled the item." *Id.* (first citing *Scott*, 33 S.W.3d at 760; and then citing *State v. Johnson*, 673 S.W.2d 877, 881 (Tenn. Crim. App. 1984)). Indeed, "when the facts and circumstances that surround tangible evidence reasonably establish the identity and integrity of the evidence, the trial court should admit the item into evidence." *Id.*

First, we address Defendant's claim that there is a "critical link missing in the chain of custody" of the narcotics because Detective Sharp could not remember whether he had submitted the item to an evidence locker or to an evidence custodian. Defendant's argument implies that the State's failure to call the evidence custodian was fatal.

In *State v. Johnson*, the defendant objected to the admission of a "rape evidence kit," arguing that the chain of custody was not sufficiently proven. 673 S.W.2d at 880-81. A doctor had collected the evidence kit from the victim and submitted the kit to nursing personnel. *Id*. at 881. The kit was later given to various law enforcement officers, and ultimately submitted to the crime laboratory in a sealed condition. *Id*. At trial, the State called no nursing personnel to testify. *Id*. This court upheld the kit's admission and accompanying testimony into evidence under an abuse of discretion standard, finding that the evidence's admission was a matter for the trial court to determine, and "[w]hether [the police officer] received the evidence kit directly from the hands of [the doctor] or through the intervention of a nurse attendant in the examining room is inconsequential." After *Johnson*, this court repeatedly has held that the State need not call as a witness every person who handled an item of evidence, and "the circumstances must only show with reasonable assurance the identity of the evidence." *State v. Ferguson*, 741 S.W.2d 125, 127 (Tenn. Crim. App. 1987) (internal citations omitted); *see also State v. Patton*, No. E2013-01355-CCA-R3-CD, 2014 WL 1512830 at *9 (Tenn. Crim. App. Apr. 16, 2014); *State v. Mitchell*,

No. W2020-01488-CCA-R3-CD, 2021 WL 5811245 at *12-13, (Tenn. Crim. App. Dec. 7, 2021), *perm. app. denied*, (Tenn. Apr. 14, 2022).

Here, contrary to Defendant's claim, the record is clear as to what happened with the exhibit. Investigator Pickett and Detective Sharp were present at the scene when officers recovered narcotics from Defendant and his room. Detective Sharp collected the narcotics and put them into individual evidence bags and sealed them. He then placed each individually sealed bag into one manila envelope. He initialed, dated, and sealed that envelope as well. Though Detective Sharp could not remember whether he gave the envelope to an evidence custodian or placed it in a secure locker, calling the custodian was not required. *See Cannon*, 254 S.W.3d at 296. At trial, Investigator Pickett testified that the drugs were packaged just as they were when they were sent to the TBI. He then opened the exhibit in open court at the prosecutor's request. Detective Sharp testified that the evidence inside the envelope reflected the evidence found at the crime scene. Ms. James and Special Agent Peterson testified that there were no chain of custody issues. Thus, the State sufficiently identified the evidence "to support a finding by the trier of fact" that the evidence is what the State claims it to be. *Scott*, 33 S.W.3d at 760; Tenn. R. Evid. 901(a). We, therefore, conclude that the trial court acted within its discretion in finding that the State properly established a chain of custody.

Defendant further argues that Ms. James "testified . . . that there was a problem with the seal; and that it had 'been opened by someone else.'" Defendant misconstrues Ms. James's testimony because, from our review of the record, Ms. James was referring to the investigator's opening of the envelope *during* trial. Ms. James testified after Investigator Pickett. She viewed the exhibit after the investigator had opened it in court. Ms. James testified the laboratory would not have accepted the exhibit for testing had it been received opened as it appeared in court. In other words, she was hypothetically explaining that evidence in that condition—with a broken seal as it appeared when she testified—would not have been accepted. She was not testifying that she received the envelope with a broken seal at the crime laboratory. Again, Ms. James and Agent Peterson testified that there were no inconsistencies with the evidence regarding the chain of custody. Thus, Defendant's argument is without merit.

III. Conclusion

For the foregoing reasons, we affirm the judgments of the trial court.

_____
MATTHEW J. WILSON, JUDGE