IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
December 18, 2025 Session

## STATE OF TENNESSEE v. TYROME CAMERON FERGUSON

**Appeal from the Criminal Court for Monroe County**
**No. 22-300   Sandra Donaghy, Judge**
_____

**No. E2025-00044-CCA-WR-CO**
_____

The Defendant, Tyrome Cameron Ferguson, was charged by a Monroe County grand jury with two counts of aggravated assault and one count of reckless endangerment with a deadly weapon relating to an alleged road-rage incident. On the first day of the Defendant's trial, the trial court found that the State had violated Tennessee Rule of Criminal Procedure 16 and declared a mistrial. In a subsequent hearing, the trial court ordered the State to pay defense counsel $500 "as a contribution toward his attorney['s] fees" as a sanction for its discovery violation. The Defendant's charges were ultimately dismissed by agreement. The State thereafter filed both an application for extraordinary appeal pursuant to Tennessee Rule of Appellate Procedure 10 and a petition for common law writ of certiorari challenging the trial court's assessment of $500. We denied the State's application for an extraordinary appeal but granted its petition for writ of certiorari. *State v. Ferguson*, No. E2025-00044-CCA-WR-CO (Tenn. Crim. App. Apr. 1, 2025) (Order). Finding that the trial court's order violated the State of Tennessee's sovereign immunity from suit, we grant certiorari and reverse and vacate the trial court's order.

**Writ of Certiorari; Judgment of the Criminal Court Reversed and Vacated**

STEVEN W. SWORD, J., delivered the opinion of the court, in which TOM GREENHOLTZ and KYLE A. HIXSON, JJ., joined.

Jonathan Skrmetti, Attorney General and Reporter; Katherine C. Redding (at oral argument), Senior Assistant Attorney General, and Johnny Cerisano, Assistant Attorney General; Stephen Hatchett, District Attorney General; and Dorothy Cherry (at trial and at motion to dismiss hearing), Chris Post, and Paul Rush (at interlocutory appeal hearings), Assistant District Attorneys General, for the petitioner, State of Tennessee.

Robert L. Jolley, Jr. (at trial and at certiorari review); and Devon G. Rodgers (at certiorari review), Knoxville, Tennessee, for the respondent, Tyrome Ferguson.

# OPINION

## I. FACTUAL AND PROCEDURAL HISTORY

On September 7, 2022, a Monroe County grand jury returned a three-count indictment charging the Defendant with two counts of aggravated assault and one count of reckless endangerment with a deadly weapon relating to an alleged road rage incident occurring on February 28, 2022. On October 18, 2022, the Defendant filed a "Request for Discovery, Inspection, and Notice of Intent to Use Evidence" pursuant to Tennessee Rule of Criminal Procedure 16 requesting that the State disclose any evidence "currently within the actual or constructive possession, custody, control[,] or knowledge of the State of Tennessee, and items which may become known, identified[,] or available through exercise of due diligence by the State of Tennessee." The Defendant specifically requested that the State allow the Defendant to inspect all "tangible objects" in the State's custody relevant to the Defendant's prosecution and any evidence the State intended to use at trial. The Defendant proceeded to trial on August 30, 2023.[1]

### A. TRIAL

Ashley King testified that at the time of the offenses, she, her husband, and her two children lived in Calhoun, Georgia.[2] Ms. King testified that on the evening of February 28, 2022, she drove herself, her husband, and her two children through Tennessee via Interstate 75 as they returned home from a visit to New York. At around 10:00 p.m., while driving in the "far left lane," Ms. King noticed a red Dodge Charger quickly approaching her vehicle. She stated that the vehicle honked and flashed its headlights at her as it approached.

Ms. King recalled that the driver of the red Dodge Charger briefly passed her before returning to drive alongside her, at which point the driver threw a "gas station cup" into her vehicle through an open window. Ms. King stated the cup passed through the open window, hit her husband, and spilled its contents "all over the car in the back seat" and on one of her children. Ms. King briefly decelerated her vehicle to assess what had happened, and when she eventually accelerated, the driver of the red Dodge Charger also accelerated to continue driving beside her. She testified that the driver then fired five or six gunshots into her vehicle, one of which struck her husband, and then drove away. Although she

---

[1] At the outset of the Defendant's trial, and outside the presence of the jury, the parties agreed to dismiss one of the Defendant's aggravated assault charges via *nolle prosequi*.

[2] By the time of the Defendant's trial, Ms. King and her family had moved to Pennsylvania.

recalled that the red Dodge Charger's windows were tinted and the night was dark, she described its driver as a black male.

Ms. King stated that she pulled her vehicle over to call 911. An ambulance and officers from the Monroe County Sheriff's Office ("MCSO") eventually arrived, and Ms. King's husband was transported to the hospital. Ms. King testified that after the incident, she noticed "bullet holes" in her vehicle "on the back fender, in the back door[,]" and "right above [her] head on the inside of the car." She also stated she later found a bullet inside her vehicle and that she and her family traveled back to Tennessee "to give [it] to a Sheriff [who] met [them] off the exit."

Following this testimony, the Defendant objected and, in a bench conference, moved to dismiss his charges. The Defendant argued that he had "specifically asked for anything that came out of that car" and had been informed that "nothing came out of the car." He asserted that the bullet Ms. King testified she had recovered from her vehicle after the shooting was never provided during pretrial discovery and that the photographs of the vehicle "showed there was no bullet hole." The Defendant stated that he was learning of the bullet "for the first time" through Ms. King's testimony and that no report indicated that such a bullet was recovered.

The State responded that it "did not receive certain information in this case" and that the Defendant did not "ask for any reports." The Defendant responded that the State was required to disclose the bullet and any records regarding it to him pursuant to Tennessee Rule of Criminal Procedure 16. He also noted that "[t]he detective in th[is] case was fired for committing perjury" in a different case. The Defendant further argued that Ms. King had not testified regarding the bullet during the preliminary hearing. The trial court dismissed the jury for the day and permitted the State to question Ms. King about the bullet she testified she had recovered.

## B. JURY-OUT HEARING

During the jury-out hearing, Ms. King testified that she took her vehicle to a mechanic a few months after the incident and that the mechanic found the bullet while working on her vehicle. Ms. King stated she called the MCSO as soon as she received the bullet and that she later met with a male MCSO officer "off the highway" to give him the bullet. She did not remember this officer's name, the month in which she met him, or whether the meeting took place before or after she testified at the Defendant's preliminary hearing.

On cross-examination, Ms. King testified that the mechanic's shop was located in Calhoun, Georgia. She stated she took her vehicle to the mechanic's shop to repair its

bullet holes. She did not recall the mechanic's name, the name of his shop, or the shop's address. She clarified that she and her family drove from Calhoun to Monroe County to meet with the MCSO officer "at a gas station." She testified that the MCSO chose this location so she would not "have to go out of [her] way[] again."

MCSO Lieutenant Jason Filyaw testified that Ms. King called the MCSO several weeks after the offenses and that he arranged to meet her at a Weigel's gas station off Interstate 75 in Monroe County to retrieve evidence allegedly involved in the offenses. Lieutenant Filyaw testified that Ms. King provided him with a "baggy" containing a bullet during this meeting and that he brought it back to the Monroe County Justice Center. There, Lieutenant Filyaw tagged the evidence with an evidence decal, sealed it with tape, signed the tape with his initials, completed an evidence custody form, and then placed the evidence into a "locker that goes into the evidence room." Lieutenant Filyaw stated he believed he also added a case note about his retrieving the bullet and taking it into custody to the original report in the Defendant's case file.

On cross-examination, Lieutenant Filyaw testified he collected the bullet on March 31, 2022, at 9:33 a.m. He recalled that, at this time, Detective Daniel Schneider[3] was still employed by the MCSO and was the lead detective on the Defendant's case. Lieutenant Filyaw stated that he made a copy of the custody authorization and provided it to Detective Schneider to be made a part of the Defendant's case file. He stated that Detective Schneider submitted the Defendant's case file to the State.

Lieutenant Filyaw testified that Detective Schneider "left" the MCSO shortly after June 2022. He testified that the MCSO's practice was to provide a defendant's completed case file to the State after a defendant's preliminary hearing. He was unaware whether any requests for testing had been made regarding the bullet.

The Defendant introduced copies of the MCSO's chain of custody forms from the Defendant's case file through Lieutenant Filyaw's testimony. The first of these forms listed the charged offense as aggravated assault and identified Ms. King's husband as the victim. The second of these forms listed the charged offense as aggravated assault and identified Ms. King as the victim. Lieutenant Filyaw agreed that neither form documented the bullet recovered from the March 31, 2022 meeting as evidence. He recalled completing an additional chain of custody form that included the bullet as a fourth piece of evidence in Ms. King's husband's case and providing that form to Detective Schneider.

---

[3] We note that while the transcript spells Detective Schneider's surname as "Snyder," other documents in the record, which include his signature, spell it as "Schneider." For consistency, we adopt the latter spelling.

On redirect examination, Lieutenant Filyaw testified he had previously been asked by the District Attorney General's Office to check Detective Schneider's files for any reports regarding the search of Ms. King's vehicle. He was unsure whether he had specifically searched for the chain of custody form listing the bullet recovered from the March 31, 2022 meeting. On recross-examination, Lieutenant Filyaw agreed that on June 8, 2022, Detective Schneider signed a "*Brady/Giglio* Certification of Prosecuting Officer" stating that he had "provided to the District Attorney's Office a copy of every item in [his] case file, including all items held by [his] department or any officer thereof" and acknowledging that he was "under a continuing duty to disclose any such new information to the District Attorney's Office promptly upon discovery." Lieutenant Filyaw testified that this form was signed after he received the bullet from Ms. King and after he provided Detective Schneider with the supplement to his evidence report.

Following this testimony, the trial court called a recess to allow Lieutenant Filyaw to obtain any additional documents from Detective Schneider's case file that were omitted from pretrial discovery. After this recess, the prosecutor stated that Lieutenant Filyaw had recovered an additional MCSO chain of custody form, dated March 31, 2022, bearing his signature, which listed a "fired bullet" as the fourth piece of evidence in the Defendant's aggravated assault charge relating to Ms. King's husband. The prosecutor averred that "the State ha[d] never seen" this document, despite requesting it "a couple of different times." The prosecutor noted that she was unsure "what else [was] in" Detective Schneider's case file and, accordingly, requested a mistrial.

The Defendant noted that he had previously filed a motion to disclose any findings from the search of Ms. King's vehicle and that the State informed him that no physical evidence had been recovered from the vehicle. He further asserted that Lieutenant Filyaw received the bullet from the victim before the Defendant's preliminary hearing and that the bullet was not mentioned during that hearing. The Defendant argued that the bullet would have been crucial to his development of a defense and, accordingly, that the State's discovery violation warranted dismissal.

Following arguments, the trial court stated it had reviewed its notes from previous hearings during the recess and found that on May 26, 2023, the Defendant "specifically requested disclosure of any and all evidence discovered during the search" of Ms. King's vehicle. The trial court recalled that it held a hearing on this motion on July 24, 2023, during which the State stated it had provided photographs of the vehicle on July 17, 2023.[4] The trial court further noted that the State represented it had "a statement but . . . no evidence," "reports to provide," or *Brady* or *Giglio* materials. From these notes, the trial

---

[4] The record does not include either a copy of the Defendant's May 26, 2023 motion or a transcript of any hearing thereupon.

court found that the Defendant had specifically requested the bullet by requesting any and all evidence recovered from the vehicle, and that the State failed to provide the bullet. Accordingly, the trial court found the State had committed a discovery violation pursuant to Tennessee Rule of Criminal Procedure 16.

Relying upon *State v. Downey*, 259 S.W.3d 723, 737 (Tenn. 2008), the trial court then discussed potential remedies for the State's discovery violation. The trial court found that granting a continuance was impractical because "it doesn't make any sense to let these jurors go home for a period of time[] to let whatever testing go on" and that prohibiting the State from introducing the bullet would "deprive[] the defense from doing any scientific testing to figure out [i]f that's a bullet from the [D]efendant's gun, or somebody else's gun, which is critical." Although the trial court noted that dismissal was permitted, it reasoned that dismissal was inappropriate in this case because "if this really happened to these people, who are just traveling through Tennessee, they have a right – all citizens of Tennessee have a right to prohibit and det[e]r this road-rage type of behavior." Accordingly, the trial court declared a mistrial "to put this case on a scheduling order that mandates the State to turn over to the defense absolutely everything in [its] custody" and to permit the parties to "fully examine" the bullet. The trial court also ordered the State to provide the Defendant with a full copy of Detective Schneider's file and any other files maintained by any other officer who had worked on the Defendant's case.

Following the trial court's ruling, the Defendant noted that he would be requesting "funds to do testing on" the bullet and "for attorney's fees to be assessed." He noted that the Defendant was "not the traditional indigent" but attributed any loss of personal finances to the mismanagement of the evidence in this case. The parties agreed to return to court the following day to review Detective Schneider's case file and to discuss the Defendant's request for funds.

## C. MOTION TO DISMISS

On October 20, 2023, the Defendant filed a motion to dismiss his charges pursuant to Tennessee Rule of Criminal Procedure 12(b), arguing that the trial court erred by granting a mistrial because the State's discovery violation prejudiced his right to a fair trial and because double jeopardy prohibited a new trial on the same charges. The State responded in opposition to this motion on December 2, 2023, and the trial court held a hearing on December 6, 2023.

At the outset of the hearing, the Defendant recounted the case's procedural history. He stated that on August 31, 2023, the parties returned to court and the State disclosed "that not only was there one bullet, [but] there were two bullets, and that this other bullet had been revealed to the District Attorney General's Office more than [thirty] days prior

to trial."[5]  The Defendant asserted that prior to Ms. King's testimony, he was under the impression that "there were no bullets found in [her] vehicle."  He argued that dismissal was warranted because he was entitled to a trial by the jury that was selected and that he had been "prepared to go forward" with the incomplete evidence he had.  He characterized the State's conduct as "egregious" and asserted that it had intentionally hidden evidence from the defense.

The State responded that the trial court's declaration of a mistrial was a sufficient remedy for the discovery violation because a mistrial would allow the parties sufficient time to test the evidence and to reassess their arguments.  The prosecutor also stated that, during her preparations for this case, she made multiple unsuccessful attempts to find Detective Schneider's case file following his departure from the MCSO.  The prosecutor noted that Detective Schneider "left the [MCSO] under less than pleasant circumstances."  The prosecutor recalled that there was "communication between the victim and another assistant" in the District Attorney General's Office about the late-discovered bullets, and she conceded that she learned about the bullets in preparation for trial.  She also conceded that she was negligent and "made a mistake" by failing to amend her notice of trial evidence pursuant to Tennessee Rule of Criminal Procedure 12(d)(2) when she learned of the bullets.  She stated that she had relied upon the file she received from the MCSO in preparing her notice and that the file did not contain any report of the bullets.  The prosecutor further asserted that "[o]ne of the bullets was in evidence and available for inspection by the defense," while the other, although requested by the State, was never provided by Ms. King and "had been left at her home" on the day of the Defendant's trial.

Following arguments, the trial court denied the Defendant's motion to dismiss, reasoning that the Defendant's right to a "[f]ull and fair" trial would be protected by the trial court's ordering the State to produce the evidence and providing the parties with time to assess the evidence.  The trial court noted that while it did not believe "the State tried to hide anything" from the Defendant, the prosecutor nevertheless could have amended her discovery responses or else notified the Defendant of the evidence's existence at some point prior to trial.  After admonishing the State, the trial court held that the Defendant should be permitted to test the evidence and to have the opportunity to cross-examine it at trial.  The trial court noted that the Defendant had lost his job during the pendency of his trial and found "it would be unfair[,] given the behavior of the State[,] to require the [D]efendant to bear the burden of the testing."  Accordingly, the trial court ordered the State to pay for ballistics testing on the bullets and to procure "a scientific report that says whether those bullets came out of the [D]efendant's gun."

The trial court then addressed attorney's fees:

---

[5] The record does not include a transcript of any proceedings occurring on August 31, 2023.

And in terms of . . . attorney['s] fees that are related to all of these post[-]dismissal hearing[s] that we have had to go through for me to figure out how we got here. And I don't know what pot of money the State [of] Tennessee has. This is not [the prosecutor's] fault a hundred percent because it's whoever touched this case all the way through until it landed in her lap for trial. She bears personal responsibility for failing to disclose it the days that she learned about it beforehand. But the State of Tennessee I think should be ordered to pay [defense counsel] $500 as a contribution toward his attorney['s] fees for this hearing, the – the last hearing which was October 30th of [20]23. To make [the Defendant] whole for this failure to disclose and divulge these bullets.

The prosecutor then asked whether the trial court's order to pay a contribution to defense counsel's attorney's fees was "a total of $500 or $500 per hearing since the date of the trial." The trial court held that the State was to pay a total of $500 as "a contribution to [defense counsel's] attorney['s] fees."

### D. SUBSEQUENT PROCEEDINGS

On January 5, 2024, the Defendant filed a motion for permission for an interlocutory appeal from the trial court's order denying his motion to dismiss his charges. In this motion, the Defendant maintained that the State's discovery violation was so prejudicial to his right to a fair trial that a mistrial was an insufficient remedy and that double jeopardy prohibited a new trial on the charges. The State filed a response in opposition on January 26, 2024.

Additionally, on January 8, 2024, the State filed a motion requesting the trial court reconsider its ruling ordering the State to pay defense counsel $500 in attorney's fees. The State argued that the trial court's order was a "sanction" which violated its sovereign immunity from suit. The record does not include a response from the Defendant to this filing.

On August 23, 2024, the trial court entered an order memorializing its bench rulings from the December 6, 2023 hearing and denying the Defendant's motion to dismiss. As relevant to this case, the trial court found that while the State's discovery violation was not intentional, it was "nonetheless at fault for failing to disclose the existence of [the bullets] prior to trial and should be punished. The Defendant has suffered prejudice by late disclosure of these bullets, and the State is to be held accountable." The trial court ordered the State to pay for expert ballistics testing of the bullets and the Defendant's firearm. The trial court further ordered the State "to pay attorney's fees to defense counsel . . . in the

- 8 -

amount of $500 for fees related to post-mistrial hearings." The trial court did not address the State's January 8, 2024 claim that its order to pay attorney's fees to defense counsel violated the State's sovereign immunity. On September 23, 2024, the State filed its own motion for permission for an interlocutory appeal, arguing that the trial court's ordering the State to pay $500 in attorney's fees as a sanction violated its sovereign immunity from suit.

The trial court held a hearing on the Defendant's motion for an interlocutory appeal on September 23, 2024. Due to a change in prosecutors assigned to the case, the parties agreed to continue the hearing until a transcript of the August 30, 2023 trial could be completed. On December 20, 2024, the parties returned to court and announced they had agreed to dismiss the Defendant's charges with prejudice. Judgments were entered that same day.

On January 9, 2025, the State filed both an application for an extraordinary appeal pursuant to Tennessee Rule of Appellate Procedure 10 and a petition for common law writ of certiorari relating to the trial court's August 23, 2024 order. As grounds, the State argued that the trial court lacked legal authority to impose monetary sanctions against the State for a discovery violation and that the monetary sanctions violated the State's sovereign immunity from suit. The Defendant filed a response in opposition on March 27, 2025, arguing that the issue was nonjusticiable because defense counsel had not yet attempted to collect the $500 the State had been ordered to pay. He also argued that the State, via the District Attorney General's Office, was not protected from suit via sovereign immunity. Upon review, this court denied the State's application for an extraordinary appeal but granted its petition for writ of certiorari. *State v. Ferguson*, No. E2025-00044-CCA-WR-CO (Tenn. Crim. App. Apr. 1, 2025) (Order).

## II.   ANALYSIS

The State argues this court should grant its writ of certiorari because the trial court's order requiring it to pay $500 as a contribution to defense counsel's fees, as punishment for its discovery violation, violated the State's sovereign immunity from suit. The State contends that no law supports such a sanction and that the General Assembly has not explicitly removed the State's sovereign immunity in the context of discovery violations. The Defendant responds that the State's argument is waived and nonjusticiable because he has not yet attempted to collect the sanctioned funds from the State. The Defendant also contends that the State's sovereign immunity argument is incorrect because Tennessee Rule of Criminal Procedure 16 provides a trial court with great discretion in fashioning a remedy for a discovery violation. Because the Defendant's waiver and justiciability arguments are prerequisites to our review, we address them first.

- 9 -

## A. WAIVER

First, the Defendant argues the State's sovereign immunity claim is waived because the State failed to first present it to the trial court via contemporaneous objection. He contends that the State did not oppose the trial court's sanction until it filed its application for permission for an interlocutory appeal on September 23, 2024. The State responds that its January 8, 2024 motion to reconsider and its application for permission for an interlocutory appeal sufficiently preserved the issue for appellate review. We conclude the issue is not waived.

Our basic rules of appellate procedure require that issues must first be presented to the trial court in order to preserve them for appellate review. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); *see also State v. Bristol*, 654 S.W.3d 917, 925 (Tenn. 2022) ("It has long been the general rule that questions not raised in the trial court will not be entertained on appeal."); *State v. Rowland*, 520 S.W.3d 542, 545 (Tenn. 2017) ("Generally, issues raised for the first time on appeal are waived."). This rule of issue preservation "ensure[s] that the defense and the prosecution are afforded an opportunity to develop fully their opposing positions on an issue." *State v. Minor*, 546 S.W.3d 59, 65 (Tenn. 2018) (citing *Puckett v. United States*, 556 U.S. 129, 134 (2009)). By requiring the parties to preserve their claims by fully litigating them below, the rule "may obviate altogether the need for appellate review." *Minor*, 546 S.W.3d at 65 (citing *State v. Jordan*, 325 S.W.3d 1, 57-58 (Tenn. 2010)).

However, both our rules of appellate procedure and our well-established caselaw provide that issues striking at a court's authority to hear a case—that is, issues of subject-matter jurisdiction—cannot be waived. *See* Tenn. R. App. P. 13(b) ("The appellate court *shall* also consider whether the trial and appellate court have jurisdiction over the subject matter, *whether or not presented for review*[.]") (emphasis added); *Agee v. Dement*, 20 Tenn. 332, 333 (1839) ("The want of jurisdiction, in a court, of the subject-matter in dispute can not be cured by appearance, by plea, by consent, or in any other way whatever; but the judgment is and must remain to all intents and purposes absolutely null and void."). Subject-matter jurisdiction is a threshold inquiry and provides "the basis for the court's authority to act." *Anderson v. State*, 692 S.W.3d 94, 103 (Tenn. 2023) (quoting *Meighan v. U.S. Sprint Commc'ns Co.*, 924 S.W.2d 632, 639 (Tenn. 1996)) (internal quotation marks omitted). A party that fails to object to a trial court's lack of subject-matter jurisdiction will not be precluded from raising such an objection on appeal. *Abdur'Rahman v. State*, 648 S.W.3d 178, 190 (Tenn. Crim. App. 2020) (citing *State v. Smith*, 278 S.W.3d 325, 329 (Tenn. Crim. App. 2008)).

- 10 -

The doctrine of sovereign immunity, as codified in Tennessee Code Annotated section 20-13-102, provides that "[n]o court in the state shall have any power, jurisdiction or authority to entertain any suit against the state, or against any officer of the state acting by authority of the state, with a view to reach the state, its treasury, funds or property." Thus, issues of sovereign immunity are issues of subject-matter jurisdiction, as they relate to a court's ability to act. *Recipient of Final Expunction Ord. in McNairy Cnty. Cir. Ct. Case No. 3279 v. Rausch*, 645 S.W.3d 160, 167 (Tenn. 2022); *see also Colonial Pipeline Co. v. Morgan*, 263 S.W.3d 827, 851 (Tenn. 2008) ("The constitutionally guaranteed principle of state immunity acts as a jurisdictional bar to an action against the state by precluding a court from exercising subject-matter jurisdiction.") (quoting 81A Am. Jur. 2d *States* § 534 (2004)).  Because the State's claim strikes at the heart of an issue of subject-matter jurisdiction, it cannot be waived.  The Defendant's argument that the State waived its claim that the trial court's order violated principles of sovereign immunity by failing to raise it via a contemporaneous objection is, therefore, unavailing.

## B. JUSTICIABILITY

The Defendant also claims this case is nonjusticiable because he has yet to attempt to collect the sanctioned funds from the State.  Relying upon the doctrine of ripeness, the Defendant argues that the State's sovereign immunity is "based on hypothetical and contingent future events."  The State responds that the trial court's order imposes an affirmative duty on it to act illegally and that withholding adjudication would result in it facing substantial hardships.  We conclude that the issue is justiciable.

At its most basic level, the judiciary exists to decide "legal controversies."  *West v. Schofield*, 468 S.W.3d 482, 490 (Tenn. 2015).  A dispute is a legal controversy when it presents issues for determination that are "real and existing, and not theoretical or abstract, and when the dispute is between parties with real and adverse interests." *Id*.  In that respect, "the province of a court is to decide, not advise, and to settle rights, not to give abstract opinions."  *Norma Faye Pyles Lynch Family Purpose LLC v. Putnam Cnty.*, 301 S.W.3d 196, 203 (Tenn. 2009) (quoting *State v. Wilson*, 70 Tenn. 204, 210 (1879)).  In determining whether a case presents a legal controversy, our courts have adopted doctrines of justiciability mirroring those employed by the United States Supreme Court and the federal courts.  *West*, 468 S.W.3d at 490.  These doctrines of justiciability include "(1) the prohibition against advisory opinions, (2) standing, (3) ripeness, (4) mootness, (5) the political question doctrine, and (6) exhaustion of administrative remedies."  *Norma Faye Pyles Lynch Family Purpose LLC*, 301 S.W.3d at 203 (citations and footnotes omitted).  "Without justiciability doctrines, the courts would be called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions and even though judicial intervention may be

unnecessary to protect individual rights." *West*, 468 S.W.3d at 490 (quoting *ACLU of Tenn. v. Darnell*, 195 S.W.3d 612, 620 (Tenn. 2006)) (internal quotation marks omitted).

The Defendant contends that the State's sovereign immunity claim is nonjusticiable under the doctrine of ripeness. Questions of ripeness ask, "whether the dispute has matured to the point that it warrants a judicial decision" and "whether the case involves uncertain or contingent future events that may or may not occur as anticipated or, indeed, may not occur at all." *B & B Enters. of Wilson Cnty., LLC v. City of Lebanon*, 318 S.W.3d 839, 848 (Tenn. 2010) (citing *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 479-80 (1990)). In other words, ripeness concerns whether the legal controversy has yet to be born. *Norma Faye Pyles Lynch Family Purpose LLC*, 301 S.W.3d at 204 ("[R]ipeness focus[es] on the suit's birth[.]") (citation omitted). This court engages in a two-pronged analysis in determining whether a case has matured to ripeness, considering first "the fitness of the issues for judicial decision" and second "the hardship to the parties of withholding court consideration." *West*, 468 S.W.3d at 491 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977)).

We first consider the fitness of this issue for judicial determination. *West*, 468 S.W.3d at 491. The Defendant asserts that the State's challenge to the trial court's order is unripe because he has not yet attempted to collect the sanctioned funds from the State. He asserts that a legal controversy will exist only if he attempts to enforce the order by collecting the funds. Until then, the Defendant reasons that the State's sovereign immunity claim is purely hypothetical and the case remains unripe. The State counters that the issue is ripe for adjudication because the trial court's order is fundamentally unlawful and imposes a duty upon the State to comply with its unlawful terms.

We agree with the State. Plainly, the parties to a controversy are required to comply with a court's orders. *See, e.g.*, *Underwood v. State*, 216 S.W.2d 26, 26 (Tenn. 1948) ("The mandates of a court must be obeyed."); *Vermillion v. Vermillion*, 892 S.W.2d 829, 833 (Tenn. Ct. App. 1994) ("A court's order is to be obeyed until modified, set aside, or otherwise nullified."). So long as a court has jurisdiction over the parties and the subject matter, entry of an order imposes a duty of compliance upon the parties until a party discharges the order or obtains a dissolution of the order. *Aladdin Industries, Inc. v. Associated Transport, Inc.*, 323 S.W.2d 222, 232 (Tenn. Ct. App. 1958). By entering an order that required the State to comply with terms which, as we conclude below, violate its sovereign immunity, the trial court imposed a duty of compliance upon the State. It matters little that the Defendant has yet to seek collection of the sanctioned funds because the trial court's order did not require the State to pay the sanctioned funds upon the Defendant's request. Instead, the trial court imposed an affirmative obligation upon the State to pay $500 towards defense counsel's fees as punishment for the State's discovery violation. Contrary to the Defendant's claims, it is the trial court's order that compels the State's

compliance, not his hypothetical attempt to enforce it. Thus, the controversy is fit for legal determination.

We next consider the hardships imposed upon the parties by withholding court consideration. *West*, 468 S.W.3d at 491. "The prototypical case of hardship comes from the claimant who faces a choice between immediately complying with a burdensome law or 'risk[ing] serious criminal and civil penalties.'" *Id.* at 492 (alteration in original) (quoting *Warshak v. United States*, 532 F.3d 521, 526 (6th Cir. 2008) (en banc)). This prototypical case is manifest here. As it stands, the State has been compelled to comply with an order that it claims violates its sovereign immunity. It now faces a hard choice: either comply with an unlawful order or refuse compliance and potentially face contempt proceedings. Tenn. Code Ann. § 29-9-102. If the State nevertheless complies with the trial court's order, it could be seen as acquiescing to an abrogation of its sovereign immunity, notwithstanding the General Assembly's exclusive right to abrogate the State's sovereign immunity protections, creating another problem entirely. *Smith v. Tenn. Nat'l Guard*, 551 S.W.3d 702, 708-09 (Tenn. 2018) (noting that both the statutory and constitutional sovereign immunity provisions "clearly reserve to the General Assembly exclusive power to waive Tennessee's sovereign immunity and to prescribe the terms and conditions under which the State may be sued") (citing *Sneed v. City of Red Bank, Tenn.*, 459 S.W.3d 17, 23 (Tenn. 2014)).

We are also mindful that this case arises from this court's granting the State's petition for common law writ of certiorari. As explained below, the common law writ of certiorari is a vehicle for providing a party extraordinary relief when, absent its use, "either party to a criminal action loses a right or forfeits an interest that can never be recaptured." *State v. Johnson*, 569 S.W.2d 808, 816 (Tenn. 1978). This is particularly true where, as here, the underlying indictments have been dismissed against the Defendant, but a portion of a trial court's order remains enforceable against a party. Although the Defendant maintains that the State should wait until he attempts to collect the sanctioned funds to challenge the order, at which point it could validly challenge the order, we again note that it is the binding effect of the trial court's order that matters most. While the underlying indictments giving rise to the Defendant's charges in this case have been dismissed, the trial court's order sanctioning the State has not been rescinded. Accepting the Defendant's argument to its logical conclusion would be to approve of a trial court's levying a cost upon the State and providing no redress thereto until and unless the Defendant decides to bring action against the State to enforce the order (presumably on the grounds that the State had yet to comply with the order's terms), potentially allowing an individual's outstanding debt against the State to hang over its head in perpetuity as a Sword of Damocles. Clearly, these hardships warrant judicial review. Accordingly, we conclude this case is ripe for judicial determination.

- 13 -

## C. SOVEREIGN IMMUNITY

We now turn to the State's sovereign immunity claim. The State argues that because the General Assembly has not explicitly waived the State's sovereign immunity from suit to permit monetary sanctions against it in cases of discovery violations, the trial court's order must be reversed. The Defendant responds that the sanction was well within the trial court's discretionary authority to prescribe a remedy for a discovery violation pursuant to Tennessee Rule of Criminal Procedure 16. We agree with the State.

This case arises following our granting of the State's petition for common law writ of certiorari. The common law writ of certiorari is "of ancient origin and has been characterized as extraordinary, remedial, revisory, supervisory, and prerogative." *Id.* at 812. In its infancy in England, the common law writ was issued in the king's name in both civil and criminal cases to order "the record of proceedings in a lower jurisdiction to be brought up to the royal court for examination." *See* Harold Weintraub, *English Origins of Judicial Review by Prerogative Writ: Certiorari and Mandamus*, 9 N.Y.L. Forum 478, 503 (1963); *see also Conners v. City of Knoxville*, 189 S.W. 870, 871 (Tenn. 1916); *City Inv. Co. v. Crawley*, 199 S.E. 747, 748 (1938). Early English decisions defined the common law writ of certiorari's review as considering questions of a lower court's "power or jurisdiction to act" in a particular case, a standard which the early American states inherited. Weintraub, 9 N.Y.L. Forum at 514, 516; *see also Tennessee Cent. R. Co. v. Campbell*, 75 S.W. 1012, 1012-13 (Tenn. 1903) (discussing the development of the common law writ of certiorari in early North Carolina law and its adoption in the first Tennessee Constitution).

Today, the common law writ of certiorari derives from Article VI, Section 10 of the Tennessee Constitution and from statute. *See* Tenn. Const. art. VI, § 10 (providing that the courts "shall have power in all civil cases, to issue writs of certiorari to remove any cause or the transcript of the record thereof, from any inferior jurisdiction, into such court of law, on sufficient cause, supported by oath or affirmation"); Tenn. Code Ann. § 27-8-101 (providing that the common law writ of certiorari "may be granted whenever authorized by law, and also in all cases where an inferior tribunal, board, or officer exercising judicial functions has exceeded the jurisdiction conferred, or is acting illegally, when, in the judgment of the court, there is no other plain, speedy, or adequate remedy"); *see also State v. L.W.*, 350 S.W.3d 911, 915 (Tenn. 2011) (noting that the statutory codification of the common law writ of certiorari recognizes that the writ may lie where "already authorized by law" prior to the statute's enactment and in certain additional instances provided by the statute) (internal quotation marks omitted). The common law writ of certiorari, as provided by Article VI, Section 10 of the Tennessee Constitution and Tennessee Code Annotated section 27-8-101, is different from the statutory writ of certiorari provided by Tennessee Code Annotated section 27-8-102. *Cooper v. Williamson County Bd. of Educ.*, 746 S.W.2d

176, 179 (Tenn. 1987); *see also State v. Lane*, 254 S.W.3d 349, 354 n. 4 (Tenn. 2008).  The scope of review provided by the common law writ of certiorari "does not ordinarily extend to a redetermination of the facts found by the administrative body," while the statutory writ of certiorari provides for *de novo* review.  *Cooper*, 746 S.W.2d at 179 (citing *Anderson v. City of Memphis*, 72 S.W.2d 1059, 1060 (Tenn. 1934)).

In that respect, the scope of the common law writ of certiorari's review is generally "limited in application and does not normally lie to inquire into the correctness of a judgment issued by a court with jurisdiction."  *State v. Adler*, 92 S.W.3d 397, 401 (Tenn. 2002), *superseded on other grounds by statute as recognized in State v. Rowland*, 520 S.W.3d 542, 545 (Tenn. 2017).  Granting certiorari is appropriate to correct a lower court's "(1) fundamentally illegal rulings; (2) proceedings inconsistent with essential legal requirements; (3) proceedings that effectively deny a party his or her day in court; (4) decisions beyond the lower tribunal's authority; and (5) plain and palpable abuses of discretion."  *Lane*, 254 S.W.3d at 355 (quoting *Willis v. Tenn. Dep't. of Corr.*, 113 S.W.3d 706, 712 (Tenn. 2003)).  Certiorari may also be granted where a party "has lost a right or interest that may never be recaptured."  *Johnson*, 569 S.W.2d at 815.

The State contends that granting certiorari is appropriate in this case because the trial court's order improperly exceeded its authority to act by abrogating the State's sovereign immunity from suit.  Like the common law writ of certiorari, the doctrine of sovereign immunity stems from the English common law.  At common law, the doctrine of sovereign immunity exempted the King of England, as the sovereign, from liability by placing him "at the very pinnacle of [] power" and rendering him "answerable to no court." *Hawks v. City of Westmoreland*, 960 S.W.2d 10, 14 (Tenn. 1997).  The State of Tennessee's sovereign immunity from suit has been established for more than 150 years.  *See City of Memphis v. Kimbrough*, 59 Tenn. 133, 135-36 (1873) ("The proposition[] that the State Government is not liable for the misfeasance or malfeasance of its officers or their failure to discharge their duties[] is well settled, and admits of no doubt.").  Also like the common law writ of certiorari, the State's sovereign immunity from suit is enshrined in both the Tennessee Constitution and in statute.  *See* Tenn. Const. art. I, § 17 ("Suits may be brought against the State in such manner and in such courts as the Legislature may by law direct."); Tenn. Code Ann. § 20-13-102(a) ("No court in the state shall have any power, jurisdiction or authority to entertain any suit against the state, or against any officer of the state acting by authority of the state, with a view to reach the state, its treasury, funds or property.").  The doctrine of sovereign immunity extends to the State's political subdivisions, *see Lawson v. Hawkins County*, 661 S.W.3d 54, 59 (Tenn. 2023), and to its employees acting in their official capacities, *see Greenhill v. Carpenter*, 718 S.W.2d 268, 271 (Tenn. Ct. App. 1986).

However, the State's sovereign immunity is not absolute, and it may be waived when the State has specifically consented to being sued. *Lawson*, 661 S.W.3d at 59 (citing *Hughes v. Metro Gov't of Nashville & Davidson Cnty.*, 340 S.W.3d 352, 360-61 (Tenn. 2011)). The General Assembly retains exclusive authority to waive the State's sovereign immunity by enacting legislation. *See* Tenn. Const. art. I, § 17; *see also Smith*, 551 S.W.3d at 708-09. Accordingly, "suits cannot be brought against the State unless explicitly authorized by statute." *Colonial Pipeline Co.*, 263 S.W.3d at 849. A statute waiving the State's sovereign immunity from suit must do so by a clear and unmistakable expression of the General Assembly's "intent to permit claims against the State." *Smith*, 551 S.W.3d at 709 (quoting *Davidson v. Lewis Bros. Bakery*, 227 S.W.3d 17, 19 (Tenn. 2007) (internal quotation marks omitted)). Therefore, "[w]e will not find a waiver of the State's sovereign immunity unless there is a statute clearly and unmistakably disclosing an intent upon the part of the [General Assembly] to permit such litigation." *Davidson*, 227 S.W.3d at 19 (quoting *Scates v. Bd. of Comm'rs of Union City*, 265 S.W.2d 563, 565 (1954)). In interpreting statutes, this court's foremost consideration is to give effect to the General Assembly's legislative intent without either restricting or expanding the statute beyond its intended scope. *Owens v. State*, 908 S.W.2d 923, 926 (Tenn. 1995). By doing so, we assess the statute's plain language, and "if the statute is clear, we apply [its] plain meaning without further complication." *Recipient of Final Expunction Ord. in McNairy Cnty. Cir. Ct. Case No. 3279*, 645 S.W.3d at 168.

At the Defendant's August 30, 2023 trial, Ms. King testified that she recovered a bullet from her vehicle following the offenses and that she provided this bullet to the MCSO. After discussing the evidentiary and discovery issues in a jury-out hearing, the trial court declared a mistrial, finding that the bullet was not provided to the Defendant pretrial via discovery, and asked the parties to return the following day to review the MCSO's files. At the conclusion of this hearing, the Defendant, through defense counsel, requested funds for ballistics testing of the bullet to help him prepare for trial and "for attorney's fees to be assessed." Although the record does not include a transcript of any hearing held on August 31, 2023, it appears that the State then disclosed to the trial court that a second bullet had also been recovered and had not been disclosed to the Defendant. At the December 6, 2023 hearing on the Defendant's renewed motion to dismiss his charges, the trial court determined that the State, via the prosecutor, had committed an "egregious" discovery violation. After admonishing the prosecutor, the trial court noted that the Defendant had lost his job during the pendency of his trial and ordered the State to pay for ballistics testing of the bullets. The trial court then ordered the State to pay defense counsel "$500 as a contribution toward his attorney fees . . . [and t]o make [the Defendant] whole for this failure to disclose and divulge these bullets." The trial court issued a written order to this effect on August 23, 2024.

The parties agree that the trial court properly determined that the State committed a discovery violation, and our review of the record supports this determination. Trial courts are vested with a variety of remedies for mitigating the harm that flows from a discovery violation, including (1) ordering that the violating party "permit the discovery or inspection" of the evidence and specifying the time, place, and manner of such discovery or inspection, along with any "other just terms or conditions"; (2) granting a continuance, (3) prohibiting the violating party from introducing the evidence at trial; or (4) entering "such other order as [the trial court] deems just under the circumstances." Tenn. R. Crim. P. 16(d)(2). A trial court has "great discretion in fashioning a remedy for non-compliance with discovery." *State v. Collins*, 35 S.W.3d 582, 585 (Tenn. Crim. App. 2000). "The sanction applied must fit the circumstances of the individual case." *State v. James*, 688 S.W.2d 463, 466 (Tenn. Crim. App. 1984) (citing *State v. Cadle*, 634 S.W.2d 623, 625 (Tenn. Crim. App. 1982)). In fashioning the appropriate remedy, the trial court must consider whether the failure to disclose evidence prejudiced the defendant, *State v. Smith*, 926 S.W.2d 267, 270 (Tenn. Crim. App. 1995), and "when considering a sanction, a court should consider whether any prejudice can be removed by lesser means," *State v. Duncan*, No. E2022-00647-CCA-R3-CD, 2023 WL 2061241, at *6 (Tenn. Crim. App. Feb. 17, 2023) (quoting *State v. Partin*, No. M2017-02381-CCA-R3-CD, 2019 WL 2383650, at *11 (Tenn. Crim. App. June 5, 2019) (internal quotation marks omitted), *perm. app. denied* (Tenn. Oct. 11, 2019)), *no perm. app. filed*. We review a trial court's chosen remedy for a discovery violation for an abuse of discretion. A trial court abuses its discretion when it "(1) applies an incorrect legal standard, (2) reaches an illogical or unreasonable decision, or (3) bases its decision on a clearly erroneous assessment of the evidence." *State v. Mangrum*, 403 S.W.3d 152, 166 (Tenn. 2013) (citing *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010)).

The Defendant contends that the trial court did not abuse its discretion in ordering the State to pay $500 towards defense counsel's attorney's fees because Tennessee Rule of Criminal Procedure 16(d)(2) provides the trial court with wide latitude in fashioning an appropriate remedy for a discovery violation, including "enter[ing] such other order as it deems just under the circumstances." He also emphasizes that the trial court considered and discarded other remedies, including dismissal, before determining that the sanction was warranted.

At the outset of our analysis, we note that while the trial court discussed at length the appropriate sanction under the circumstances, it did not specifically cite Rule 16—nor, as the State notes, any other legal basis—in support of its requiring the State to pay $500 as a contribution towards defense counsel's fees. Regardless, inasmuch as the trial court relied on Rule 16 as a basis for its ruling, it erred because nothing in Rule 16's language specifically authorizes levying monetary sanctions against the State. Any abrogation of the State's sovereign immunity must come from the General Assembly's clear and

unequivocal waiver of the State's sovereign immunity via statute. Of course, while the Tennessee Rules of Criminal Procedure are not statutes, they constitute the law of this state and are approved by the General Assembly. *State v. Millbrooks*, 819 S.W.2d 441, 445 (Tenn. Crim. App. 1991) (citing *Tennessee Department of Human Services v. Vaughn*, 595 S.W.2d 62, 63 (Tenn. 1980)). The General Assembly has specifically provided to the Tennessee Supreme Court the authority to "prescribe by general rules the forms of process, writs, pleadings and motions, and the practice and procedure in all of the courts of this state in all civil and criminal suits, actions and proceedings." Tenn. Code Ann. § 16-3-402. These rules take effect only upon the Chief Justice's reporting them to the General Assembly and their approval by both the House of Representatives and the Senate. *Id*. § 16-3-404. Upon their approval, the rules become effective and carry the force of the law, and "all laws in conflict with the rules shall be of no further force or effect." *Id*. § 16-3-406.

The Defendant relies upon Rule 16(d)(2)(D)'s provision that the trial court may "enter such other order as it deems just under the circumstances" to mitigate the harm flowing from a party's discovery violation. While "[t]he General Assembly's exclusive power to define the remedies available to a party prevailing in litigation against the State extends to awards of attorney's fees and costs," *Zumstein v. Roane County Exec./Mayor*, No. E2016-02037-COA-R3-CV, 2017 WL 3600462, at *3 (Tenn. Ct. App. Aug. 21, 2017), *no perm. app. filed*, Rule 16(d)(2)(D)'s language is a far cry from the type of specific, clear, and unmistakable language required to validly waive the State's sovereign immunity from suit. For example, the Equal Access to Justice Act permits a court to award up to $10,000 in "reasonable and actual fees and other expenses" to a party prevailing against a state agency under its provisions, "unless the prevailing party is a state agency." Tenn. Code Ann. § 29-37-104(a)(1); *see also State v. Thompson*, 197 S.W.3d 685, 691 (Tenn. 2006). That section of the Code further provides clear direction as to which State department should pay the assessed funds. *See* Tenn. Code Ann. § 29-37-104(d). The General Assembly has similarly removed the State's sovereign immunity from suit by permitting the award of attorney's fees to parties prevailing against the State in certain instances for claims arising under the Tennessee Human Rights Act ("THRA"). *See Sneed*, 459 S.W.3d at 27 (concluding that because the THRA "provides broad remedies to prevailing parties" in civil actions and because the Code specifically identified governmental employers as permissible parties to such claims, the General Assembly's "clear legislative intent" was to remove the State's sovereign immunity in this context by "plac[ing] governmental employers in the same standing as private employers.") (first citing Tenn. Code Ann. §§ 4-21-102, -311; and then citing *Eason v. Memphis Light, Gas & Water Div.*, 866 S.W.2d 952, 955 (Tenn. Ct. App. 1993)). Nothing in Rule 16(d)(2)(D)'s "catch-all" provision addresses, much less removes, the State's sovereign immunity from suit or implies that sanctions may be properly levied against the State in the event of a discovery violation. The absence of any clear and unequivocal waiver of the State's sovereign immunity in Rule

16 or elsewhere in the Code evidences the General Assembly's intent to maintain that immunity in the case of a prosecutor's discovery violation. *Recipient of Final Expunction Ord. in McNairy Cnty. Cir. Ct. Case No. 3279*, 645 S.W.3d at 168; *Smith*, 551 S.W.3d at 709; *Davidson*, 227 S.W.3d at 19.

Setting aside our well-settled law that any statute waiving the State's sovereign immunity from suit must do so explicitly rather than implicitly, our Code explicitly provides that the Tennessee Rules of Criminal Procedure cannot be interpreted to abrogate a constitutionally reserved right. Tennessee Code Annotated section 16-3-403 provides that "[t]he rules prescribed by the supreme court pursuant to [Code section] 16-3-402 shall not abridge, enlarge or modify any substantive right, and shall be consistent with the constitutions of the United States and Tennessee." As stated above, sovereign immunity is a constitutionally reserved substantive right. Since the Code prohibits the Rules from abrogating a substantive right, Tennessee Rule of Criminal Procedure 16 cannot abrogate sovereign immunity. Accordingly, we hold that the trial court's order exceeded the scope of its jurisdiction.

The Defendant also asserts that the trial court maintains vast discretion to order the State to contribute funds towards attorney's fees and "to pay for forensic testing or other expenses of litigation" from the State's indigent defense fund. *See* Tenn. Code Ann. § 40-14-202; Tenn. Sup. Ct. R. 13. But while the trial court contemplated ordering the State to pay for the ballistics testing from the indigent defense fund, it did not do so in the context of its ordering the State to pay a contribution towards the Defendant's attorney's fees as a sanction for its discovery violation, and it did not include that specification in its August 23, 2024 order. To the contrary, the trial court explicitly noted that it did not "know what pot of money the State of Tennessee has" related to that issue. Moreover, defense counsel was retained, and the trial court never specifically found the Defendant to be indigent. This argument is unavailing.

Within his argument that the State is not entitled to sovereign immunity in this case, the Defendant asserts that sovereign immunity has historically "been the recipient of valid criticism from the judiciary" and "is worthy of reconsideration." He does not explain what new considerations should be made, nor does he otherwise develop this argument. Regardless, we reiterate that it is the province of the legislative branch, not the judiciary, to abrogate the State's sovereign immunity. *Smith*, 551 S.W.3d at 708-09; *Colonial Pipeline Co.*, 263 S.W.3d at 849. It determines when, how, and whether the State's sovereign immunity is waived. Inasmuch as the Defendant suggests that sovereign immunity in this context should be reexamined, his argument is better addressed to the General Assembly.

Similarly, the Defendant also asserts that the State's sovereign immunity claim is incorrect because he may have a "perfectly cognizable claim . . . for monetary damages" against the State, via the District Attorney General's Office, under 42 U.S.C. § 1983. But he does not present the merits of such a claim to this court, and, as he concedes, this "is not the appropriate time to raise these arguments before this court." We will not endeavor to develop the Defendant's argument on his behalf or further engage with this claim. *See Sneed v. Bd. of Prof'l Responsibility*, 301 S.W.3d 603, 615 (Tenn. 2010) ("It is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her[.]").

In sum, we conclude that the trial court's order that the State pay $500 in attorney's fees as a sanction for its violation of the rules of discovery violated the State's sovereign immunity from suit. In so ruling, we do not attempt to diminish the severity of the State's discovery violation. The prosecutor's inaction in this case led to the obfuscation of critical evidence, deprived the Defendant of the opportunity to review, test, and cross-examine that evidence before it was introduced at trial, and deprived the alleged victims of the opportunity to have their day in court. Rule 16 provides a number of different avenues down which a trial court may, in its discretion, take a case in correcting a party's discovery violation. *See* Tenn. R. Crim. P. 16(d)(2). The trial court properly directed this case down two of those avenues by determining that the discovery violation presented a manifest necessity for a mistrial and by providing the parties with additional time to examine the evidence and reassess their respective defenses. *Id*. However, it also directed this case down a third avenue by ordering the State to pay $500 towards defense counsel's fees as a sanction for the discovery violation. This was an improper avenue for the court to take. Because the General Assembly has not clearly and unequivocally waived the State's sovereign immunity in this context, either in Rule 16 or in any other section of the Code, the trial court committed reversible error by exceeding the scope of its jurisdiction. *Lane*, 254 S.W.3d at 355. Accordingly, we grant certiorari to reverse and vacate the trial court's order.

## III. CONCLUSION

Following our review of the record and based on the foregoing analysis, we grant certiorari and vacate the trial court's order assessing a $500 sanction against the State.

s/ *Steven W. Sword*
_____
STEVEN W. SWORD, JUDGE

- 20 -